IN THE

# United States Court of Appeals

## FOR THE TENTH CIRCUIT

◆◆

THE UNITED STATES OF AMERICA EX REL. MICHELE COFFMAN,

*Plaintiff-Appellant,*

—v.—

THE CITY OF LEAVENWORTH, KANSAS,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
HONORABLE JULIE A. ROBINSON
D.C. NO. 2:14-CV-02538-JAR

## BRIEF FOR PLAINTIFF-APPELLANT

MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com

*Attorneys for Plaintiff-Relator-
Appellant Michele Coffman*

October 1, 2018

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iv

GLOSSARY OF TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   viii

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    The City's Contracts with Federal Agencies . . . . . . . . . . . . . . . . . . . . . . . .   6

    The City's Wastewater Treatment Plant and Discharge Permits . . . .   8

    The Broken Sewer Pipe Over Five Mile Creek and the Flood
        of 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

    The City's Discharge to Five Mile Creek Upstream of the Broken
        Sewer Pipe . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

    The City's Dumping of Sewage on the Ground . . . . . . . . . . . . . . . . . . . . .   11

    The City's Consent Order with EPA Regarding Certain NDPES
        Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

    The False Claims Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

    The Clean Water Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

SUMMARY OF THE ARGUMENT ...................................... 21

ARGUMENT .............................................................. 24

    The district court erred in granting summary judgment to
the City ................................................................. 24

I.  Coffman can establish a claim under the False Claims Act
based on implied certification..................................... 25

    A.  Implied certification under *Escobar* and the Tenth Circuit
case law......................................................... 26

    B.  The City's invoices to the government implied that
the City was entitled to payment ............................. 29

    C.  The City's failure to disclose its noncompliance with
environmental laws, viewed in the light most favorable
to Plaintiff, made the representations in its invoices
misleading half-truths ......................................... 31

        1.  The City discharged raw, untreated sewage without
a permit ................................................... 31

        2.  The City discharged treated wastewater without
a permit ................................................... 33

        3.  The City failed to prevent sanitary sewer overflows.... 34

        4.  The City dumped sewage waste in violation of
environmental laws ...................................... 34

    D.  The district court's summary judgment ruling took an
improperly narrow approach to implied false certification
under *Escobar* and the Tenth Circuit case law.............. 38

II.  The City's misrepresentations to government agencies
were material to the government's payment of
the City's invoices ................................................. 41

A. Standard for Materiality......................................... 42

B. The City's failure to inform the government that the City
had violated environmental requirements was material
to payment of the City's invoices ........................... 45

C. The district court applied an improperly narrow standard for
materiality ..................................................... 49

III. The City acted with the requisite scienter in submitting claims for
payment ............................................................ 51

CONCLUSION............................................................ 56

STATEMENT REGARDING ORAL ARGUMENT ..................... 57

CERTIFICATE OF COMPLIANCE...................................... 58

CERTIFICATE OF DIGITAL SUBMISSION........................... 59

CERTIFICATE OF SERVICE ........................................... 60

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Ab-Tech Construction, Inc. v. United States*,
    31 Fed. Cl. 429 (1994) .................................................. 27

*United States ex rel. Badr v. Triple Canopy, Inc.*,
    857 F.3d 174 (4th Cir. 2017)............................................ 44, 54

*United States ex rel. Brooks v. Stevens-Henager College*,
    305 F. Supp.3d 1279 (D. Utah 2018) ................................. 44

*Brue v. Gonzales*,
    464 F.3d 1227 (10th Cir. 2006) ........................................ 20

*United States ex rel. Campie v. Gilead Sciences, Inc.*,
    862 F.3d 890 (9th Cir. 2017) ........................................... 44

*Comite Pro Rescate De La Salud v.*
    *Puerto Rico Aqueduct and Sewer Authority*,
    888 F.2d 180 (1st Cir. 1989) ........................................... 36

*United States ex rel. Conner v. Salina Regional Health Center*,
    543 F.3d 1211 (10th Cit. 2008) ............................ 27, 42, 47, 50

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
    842 F.3d 103 (1st Cir. 2016) ........................................... 44

*United States ex. rel. Fallon v. Accudyne Corp.*,
    921 F. Supp. 611 (W.D. Wis 1995) ................................... 28

*United States ex rel. Gravitt v. General Electric Co.*,
    680 F.Supp. 1162 (S.D. Ohio), *appeal dismissed*,
    848 F.2d 190 (6th Cir.) *cert. denied sub nom.*,
    *General Electric Co. v. United States*, 488 U.S. 901 (1988) ........ 16

*United States ex rel. Harman v. Trinity Indus., Inc.*,
    872 F.3d 645 (5th Cir. 2017) ........................................... 44

*Heckler v. Community Health Servs.*,
    467 U.S. 51 (1984) ..................................................... 54

*Junius Constr. Co. v. Cohen*,
    257 N.Y. 393 (1931) ................................................... 43

PAGE(S)

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*,
   614 F.3d 1163 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

*United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health*
   *Sys. Corp.*, 276 F.3d 1032 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

*United States ex. rel. Pickens v. Kanawaha River Towing*,
   916 F. Supp. 702 (S.D. Ohio 1996), *aff'd* 194 F.3d 1314
   (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   28

*United States ex rel. Polukoff v. St. Mark's Hospital*,
   895 F.3d 730 (10th Cir., July 9, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*,
   892 F.3d 822 (6th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*United States ex rel. Quirk v. Madonna Towers, Inc.*,
   278 F.3d 765 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) . . . . . . . . . . . . .   19

*Shaw v. AAA Engineering & Drafting, Inc.*,
   213 F.3d 519 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 39

*Smothers v. Solvay Chemicals*,
   740 F.3d 530 (10th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Tabor v. Hilti, Inc.*,
   703 F.3d 1206 (10th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*United States v. Takea Extrusions, LP*,
   341 F.3d 843 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   53

*United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*,
   820 F.3d 1162 (10th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29, 39, 42

*Tolan v. Cotton*,
   134 S.Ct. 1861 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*U.S. v. Science Applications Intern. Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States Department of Energy v. Ohio*,
  503 U.S. 607 (1992)....................................................... 48

*United States v. Science Applications Intern. Corp.*,
  958 F.Supp. 2d 53 (D.D.C. 2013) .................................... 52

*United States v. United States Cartridge Co.*,
  198 F.2d 456 (8th Cir. 1952),
  *cert denied*, 345 U.S. 910 (1953) .................................... 52

*Universal Health Services, Inc. v.*
  *United States and Massachusetts ex rel. Escobar*,
  136 S.Ct. 1989 (2016)...............................................*passim*

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
  827 F.3d 201 (1st Cir. 2016) ........................................ 43

## Statutes

1 U.S.C. §1 (1998) ...................................................... 52

28 U.S.C. § 1291 ....................................................... 2

28 U.S.C. §§ 1331, 1367, and 1391 .................................. 2

31 U.S.C. (b)(1)(A) ..................................................... 51

31 U.S.C. § 3729(a)(1)(A) .............................................. 51

31 U.S.C. § 3729(b)(4) .............................................. 42, 49

31 U.S.C. § 3729, *et seq.* ("False Claims Act")...................... 2

33 U.S.C. § 1251 ....................................................... 17

33 U.S.C. § 1342 ............................................... 17, 32, 36

33 U.S.C. § 1345 ....................................................... 35

33 U.S.C. § 1362(7)..................................................... 17

33 U.S.C. § 1362(12) ................................................... 17

33 U.S.C. § 1362(14) ................................................... 32

42 U.S.C. § 6945(a)..................................................... 37

Clean Water Act........................................................ 36

Resource Conservation and Recovery Act ("RCRA") . . . . . . . . . . 35, 36, 37, 38

## Regulations

40 CFR Ch. I § 15.31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46

40 CFR § 257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 37

40 CFR § 257.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    37

40 CFR § 257.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

40 CFR § 257.3-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

40 CFR § 257.3-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

40 CFR § 257.3-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

40 CFR § 503 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 35, 36

40 CFR § 503.6(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    36

48 CFR § 52.223-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    47

48 CFR § 52.223-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    47

48 CFR § 52.223-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     7

## Other Authorities

131 Cong. Rec. 17818 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

1323 Cong. Rec. S11244 (daily ed. Aug. 11, 1986) . . . . . . . . . . . . . . . . . . . .    16

Executive Order No. 11,738, 38 Fed. Reg. §25161 (Sept. 12, 1973) . . . .    46

Restatement (Second) of Contracts § 162(2) . . . . . . . . . . . . . . . . . . . . . . . . .    43

Restatement (Second) of Torts § 538 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

# GLOSSARY OF TERMS

BOP: Federal Bureau of Prisons

CWA: Clean Water Act

EPA: Environmental Protection Agency

FCA: False Claims Act

KDHE: Kansas Department of Health and Environment

NPDES: National Pollutant Discharge Elimination System

POTW: Publicly-owned treatment works

RCRA: Resource Conservation and Recovery Act

VA: Veterans Administration

WWTP: Wastewater treatment plant

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

Jurisdiction of the district court was invoked pursuant to 28 U.S.C. §§ 1331, 1367, and 1391. The action was authorized and instituted pursuant to False Claims Act, 31 U.S.C. § 3729, *et seq.*, and the common law for the state of Kansas.

This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1291, based on a final judgment. The district court entered and order granting the City of Leavenworth's Motion for Summary Judgment on March 23, 2018. A1173-1221. The court entered a final judgment on July 30, 2018.[1] A1225. Appellant Michele Coffman filed a timely notice of appeal on August 2, 2018. A1226-1227.

---

[1] The district court's March 23, 2018 order granted summary judgment for the City of Leavenworth on Coffman's environmental False Claims Act issues, but denied the City's request for summary judgment on Coffman's False Claims Act retaliation claim. The parties subsequently resolved the retaliation claim prior to trial, and on July 30, 2018, Judge Robinson entered a final judgment on the case in its entirety, making the environmental False Claims Act case ripe for appeal.

# STATEMENT OF THE ISSUES

1. The district court ruled that Coffman had not satisfied the implied certification standard under the False Claims Act because she had not shown evidence that the City of Leavenworth failed to treat wastewater as agreed in contracts with government agencies. Coffman presented significant evidence to the district court that the City of Leavenworth did not treat wastewater as contracted. Did the district court fail to consider the evidence in the light most favorable to the nonmoving party?

2. The Supreme Court has established that a contractual misrepresentation is material if a reasonable person would attach importance to it, if it was "central" to the contract, or if it was part of the "essence of the bargain." The *raison d'etre* of the City's wastewater treatment contracts with government agencies was compliance with the Clean Water Act, but the district court held that the City's noncompliance was not material to the government's obligation to pay. Was the district court's ruling erroneous?

3. The Clean Water Act forbids discharges of pollutants to waters of the United States except as permitted under the Act. The City was aware it was discharging untreated pollutants into receiving waters without a permit, even as it invoiced the government for treating its wastewater in accordance with

the Clean Water Act. Did the City act with the scienter necessary to support

a claim under the False Claims Act?

## STATEMENT OF THE CASE

Plaintiff-Relator-Appellant, Michele Coffman ("Coffman") worked for Appellee City of Leavenworth in its wastewater treatment plant from April 29, 2010 until October 4, 2013. On October 21, 2014, she filed a claim under seal as a Relator under the False Claims Act and under Kansas common law seeking compensation for the United States arising from Leavenworth's fraudulent conduct as well as for herself for her constructive discharge from her position following retaliation for her having reported her concerns of fraud.

Prior to trial, Coffman moved for partial summary judgment as to liability under the False Claims Act, and the City of Leavenworth moved for summary judgment on all claims. A87. The district court entered an order granting summary judgment to the City on all claims except for the False Claims Act retaliation claim. A1173-1221. After the parties resolved the retaliation claims prior to trial, the district court entered a final judgment in Leavenworth's favor. A1225. Coffman timely appealed the district court's decision. A1226-1227. Coffman appeals only the district court's decision on the False Claims Act implied false certification claim arising from environmental violations.

**STATEMENT OF THE FACTS**

**Background**

Coffman began work at the City of Leavenworth in its wastewater treatment plant (WWTP) as an operator in April 2010, and rose quickly through its ranks to become the Assistant Superintendent. A67. Through her work at the WWTP, she became aware of fraudulent conduct by the City of Leavenworth, both with respect its interactions with the Federal Emergency Management Agency (FEMA) following a recent flood, and with regard to its compliance with various federal environmental laws. As set forth above, the district court entered judgment on behalf of Leavenworth on all False Claims Act claims other than retaliation. However, Coffman appeals only her claim arising from Leavenworth's failure to disclose its noncompliance with federal environmental laws to government agencies with which it had wastewater treatment contracts.

**The City's Contracts with Federal Agencies**

The City of Leavenworth maintains contracts with the Veterans Administration, the United States Army and the United States Bureau of Prisons for wastewater treatment services. A68. These contracts, some entered into in the 1970s, are still in effect today. A671-675. The City's contract with the Department of the Army specifically provides that "[t]he Contractor shall operate his sewage disposal and treatment facilities in conformity with applicable laws, rules, and

6

regulations established by Federal, state, and local authorities." Leavenworth's corporate designee specifically agreed that this provision of the contract was important. A677-678, A705-706. The City's contract with the Department of the Army also incorporates 48 C.F.R. § 52.223-3, which, as incorporated, requires the City to use its best efforts to comply with clean water standards, including compliance with the City's wastewater discharge permits. A727-728. The Army contract specifically requires the City to dispose of wastewater in such a way that it does not adversely impact public health. Specifically, the City's contract with the Department of the Army provides that:

> The City of Leavenworth (The Contractor) shall furnish and maintain a sanitary sewer connection and a sanitary sewer service as required by Fort Leavenworth (The Government) and shall receive, carry, treat, and dispose of all sanitary sewage originating at the Point of Delivery in such amounts as the Government will release into the Contractor's sanitary sewer system and in a manner and by such means as will constitute no hazard to the public health. The Contractor shall operate his sewage disposal and treatment facilities in conformity with applicable laws, rules and regulations established by Federal, state and local authorities. The period of performance for this requirement is 01 Jul 06 to 30 Jun 16.

A677-678.

The City's contract with the Veterans Administration contains a similar provision requiring environmental compliance. A607-620.

The City bills the federal agencies with which it contracts on a monthly basis, based on each agency's flow or output to the wastewater treatment plant.

7

(A703-704, A1025) and the City receives monthly payments on these contracts. A68.

**The City's Wastewater Treatment Plant and Discharge Permits**

The City's wastewater treatment plant consists of primary clarifiers, trickling filters, final clarifiers, holding tanks for sludge, a belt press to dewater sludge, and a UV treatment building. After going through the final clarifiers and the UV treatment building, wastewater is discharged to the Missouri River. A689. The City of Leavenworth has had two National Pollutant Discharge Elimination System ("NPDES") permits during the relevant time period – one for the time period from 2008 through 2012 and another for the time period January 2013 through 2017. A69, A380-381, A392-406. The NPDES permits allow the City to discharge treated effluent from its wastewater treatment plant into the Missouri River. *Id*. However, the NPDES permits place limitations on the concentration of pollutants in the City's discharged wastewater, such as biochemical oxygen demand, total suspended solids, E. coli, and pH. A380-391, A392-406. The NPDES permits also contain a condition stating that:

> All discharges authorized herein shall be consistent with the permit requirements. The discharge of any pollutant not authorized by this permit or of any pollutant identified in this permit more frequently than or at a level in excess of that authorized shall constitute a violation of this permit.

*Id*. The NPDES permits further require that the City "at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances)." *Id*. Although the NPDES permits provide that the City may file a request for modification of the permit for certain identified reasons, the City is unaware of any documents reflecting a permit modification relating to any discharge into Five Mile Creek. *Id.*; A725.

**The Broken Sewer Pipe Over Five Mile Creek and the Flood of 2011**

On or before August 25, 2010, the City of Leavenworth experienced a sewer line break near manholes AAB-ABA (also referred to as manholes 4284 and 4268) crossing Five Mile Creek, in front of the WTP. A68, A682-731. The sewer pipe leaked into Five Mile Creek, and caused, in the words of Michael McDonald, the City's Public Works Director and City Engineer, a discoloration in Five Mile Creek that looked "like a sewer spill in the creek. Dark gray. I believe there was a green color to it." A683. McDonald further clarified that the water flowing from the broken sewer pipe into Five Mile Creek was raw sewage from "[t]he main trunk sewer, large diameter sewer that serves most of the town." A684, 715. In the opinion of the City's expert witness, James Condon, raw, untreated sewage discharged into water, is a "pollutant," and sewage leaking from the broken sewer pipe into Five Mile Creek was the addition of a pollutant from a pipe. A738, 740-741.

The City was aware of the continued discharge into Five Mile Creek from August 2010 until it was repaired in November 2011, and attempted temporary measures, including sandbags, an inflatable plug, and trying to bypass the leak using a Godwin pump to keep the broken sewer pipe from leaking into Five Mile Creek. A683, A711, A749-750, A753-754, A757-760. However, according to McDonald, the City Public Works manager, these efforts resulted in "marginal" results. A711.

On November 2, 2011, Bob Patzwald, the City's Deputy Public Works Director, stated in an email to various City personnel that a solution must be found for the broken sewer pipe, and that "I believe kdhe is now poking around and we will be in big trouble in short order if we don't act." A773. The City further realized that "[i]t's a violation to have a sanitary sewer overflow of this type that is not being addressed in a meaningful manner." A710, A773. Despite this realization, the City specifically acknowledged that no reason existed why the broken sewer pipe could not have been repaired in August 2010. A712. On November 17, 2011, Linaweaver Construction capped the broken line by filling it with concrete. A92 ¶ 13. The City did not inform the Federal agencies with which it contracted about the leak. A724.

**The City's Discharge to Five Mile Creek Upstream of the Broken Sewer Pipe**

After the broken sewer pipe leaked sewage into Five Mile Creek, the City began discharging wastewater, through a discharge pipe, from its final clarifiers into Five Mile Creek upstream of the broken sewer pipe to "improve both the smell and appearance" and to "move it downstream." A684, 707, 776-777, 793-794. The City permitted this discharge, despite its acknowledgement that "there is no permit that says [it] can discharge water directly to Five Mile Creek." A686, A700-701. James Condon, the City's expert witness, confirmed that the City's discharge from its final clarifiers into Five Mile Creek was the addition of a pollutant into Five Mile Creek from a pipe. A742.

**The City's Dumping of Sewage on the Ground**

The City used Vactor trucks to unclog sewer pipe backups. The Vactor truck vacuumed sewer pipe backups, and after doing so, the septage removed from the clog was brought to the City's wastewater treatment facility in the truck. Between at least 2008 and 2013, McDonald acknowledged that the truck would return to the wastewater treatment plant, and operators emptied the water into the plant, and then dump the remaining material on the ground in back of the wastewater treatment plant. A687-688. McDonald acknowledged the dumped material included septage that came out of the sewer system, and also solid materials such as plastics and cloth. A701-702. James Condon, the City's expert

witness, opined that the material vacuumed into the Vactor truck was most likely domestic septage. A743-744. According to Condon, if the material the City dumped from its Vactor truck constituted "sewage sludge" under the applicable regulations, then the regulations would impose monitoring, recordkeeping, and reporting requirements, and the City would be required to obtain a permit under 40 CFR 503. A745-777.

The City acknowledged the area where solids were dumped was not enclosed, was not a lined pit, and contained no warning signs. A694-695. The City further acknowledged it never performed any laboratory analysis on the dumped material. A696. Further, McDonald conceded the City had never obtained a permit under 40 CFR 503 for disposal or land application of the dumped material. *Id*.

McDonald recognized that the dumping was "unseemly" and could be "perceived as illegal dumping" and stated that he had directed the wastewater treatment plant superintendent to cease the sewage dumping practice. A688. McDonald was not the only one who had concerns about the dumping. In fact, the City received complaints from local merchants about the odor from the dump site. A698-699.

In a June 1, 2012 letter to the City attaching a report of an April 2012 inspection, KDHE stated that "The vac trucks are dewatered. Then solids are deposited in an area for processing. Solids are being collected and handled

properly but please make sure any excess water from the solids does not migrate from the site." A778. However, the inspection report attached to KDHE's June 1, 2012 letter contains no record that KDHE had inspected the City's sewage dump sites. *Id.* Additionally, wastewater treatment personnel observing the KDHE inspection summarized in the attachment to KDHE's June 1, 2012 letter noted that the KDHE inspector did not inspect the City's sewage dump sites. A734-735, A766.

In any event, the City is unaware what KDHE was told or what KDHE inspected in the April 2012 inspection, or what the basis was for KDHE's statement that the dumped materials were handled properly. A697. Similarly, the City did not inform the Army, the VA, or the Bureau of Prisons, with whom it had federal contracts, of its practice of dumping materials from the Vactor truck. A699.

**The City's Consent Order with EPA Regarding Certain NDPES Violations**

On December 21, 2015, the City entered a Consent Order with the Environmental Protection Agency ("EPA"), signed by EPA personnel and the Mayor of Leavenworth, addressing certain NPDES permit violations. A780-790. The EPA Consent Order stated that "[w]ithin the past five (5) years, [the City] has discharged untreated wastewater from locations within [the City's] POTW, also known as SSO's. None of the locations of these discharges are the Outfall 001A1

identified in [the City's] NPDES permits." *Id.* ¶ 25. The City's unpermitted discharges occurred at least between March 2010 and March 2014. *Id.* ¶¶ 26, 32. Further, the City's designated expert, James Condon, testified that, when an overflow from the City's sewer pipes makes its way to a creek, the result is the addition of a pollutant to the creek. A739. These discharges resulted from "the City's failure to at all times properly operate and maintain its POTW consistent with its standard conditions" in its NPDES permits. A784 ¶ 31. Of the unpermitted discharges described in the EPA Consent Order, 19 involved discharging untreated wastewater into tributaries of the Missouri River. A783 ¶ 27.

# STATUTORY BACKGROUND

**The False Claims Act**

Laws authorizing bounties for false claims against governments date back centuries, at least to 13th century England, when King Henry III offered honest citizens a bounty in exchange for their knowledge about fraud or theft against the kingdom.   This became the first false claims or "*qui tam*" law.[2]

In the United States, President Lincoln signed the False Claims Act ("FCA") into law in 1863, in response to concerns about unscrupulous contractors selling the Union sick horses, contaminated meat, broken rifles, and ships that didn't float. The FCA served to protect the government as a consumer, and to empower and incentivize individuals with personal knowledge of fraud against the government to act as private attorneys general. Under the law, these honest citizens received a percentage of the monies they recovered on behalf of the government as a reward for sharing their knowledge of fraud against the government.

In 1986, Congress amended the FCA in response to public outrage over contracting fraud against government budgets, which included contractors

---

[2] Qui tam is an abbreviation of the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which translates roughly to "he who sues in this matter for the king as well as for himself."

charging the government $400 for a hammer and $7,000 for a coffeepot.[3] The 1986 amendments modified the scienter requirement under the Act, so that a Relator need not show specific intent to defraud for a viable claim, and to clarify that "knowing" violations under the Act would include not only actual knowledge, but also deliberate ignorance and reckless disregard for the truth.

With those amendments, Congress sought to impose an affirmative duty of care on contractors. "Federal contractors, persons and entities doing business with the government must be made to understand that they have an affirmative obligation to ascertain the truthfulness of the claims they submit. No longer will federal contractors be able to bury their heads in the sand to insulate themselves from the knowledge a prudent person should have before submitting a claim to the government. Contractors who ignore or fail to inquire about red flags that should alert them to the fact that false claims are being submitted will be liable for those false claims."[4]

**The Clean Water Act**

The Clean Water Act, enacted in 1972 and signed into law by President Nixon, is designed to "restore and maintain the chemical, physical, and biological

---

[3] 131 Cong. Rec. 17818 (1985)(remarks of Rep. Weiss); see also *United States ex rel. Gravitt v. General Electric Co.,* 680 F.Supp. 1162, 1164 (S.D. Ohio), *appeal dismissed*, 848 F.2d 190 (6th Cir.) *cert. denied sub nom., General Electric Co. v. United States*, 488 U.S. 901 (1988).

[4] See, e.g., 1323 Cong. Rec. S11244 (daily ed. Aug. 11, 1986).

integrity of the Nation's waters." 33 U.S.C. § 1251. Rather than regulate the quality of receiving waters themselves, the Act regulates the levels of pollutants entering those waters. More specifically, the Act prohibits the discharge of any pollutant into waters of the United States, except in accordance with certain requirements, most notably 33 U.S.C. § 1342, which provides for issuance of wastewater discharge permits under the National Pollutant Discharge Elimination System ("NPDES"). The "discharge of a pollutant" includes "any addition of any pollutant to navigable waters from a point source." 33 U.S.C. § 1362(12). "Navigable waters" in this context does not necessarily mean that the waters are in fact navigable, but is defined more generally to include "waters of the United States." 33 U.S.C. § 1362(7).

During the time period relevant to this action, the City of Leavenworth has held two NPDES permits, one effective in 2008 and one effective in 2013, to discharge treated wastewater from its wastewater treatment plant to the Missouri River. A380-391, A392-406. The City's permit was issued by the Kansas Department of Health and Environmental Control ("KDHE"), to which the Environmental Protection Agency has delegated authority to administer the Clean Water Act in the State of Kansas. The permit limits the concentrations of certain pollutant parameters, and it prohibits the discharge of any pollutant not authorized by the permit. SOF 15-16. The permit, like any Kansas NPDES permit, may be

modified, but any request to modify the permit "shall be in writing and shall contain facts or reasons supporting the request." KAR 28-16-62(g)(1).

**STANDARD OF REVIEW**

This Court reviews the grant of summary judgment *de novo*, applying the same standard as the district court. *See Smothers v. Solvay Chemicals,* 740 F.3d 530, 538 (10th Cir. 2014). With respect to the order granting the City's motion for summary judgment, the court views the facts in the light most favorable to Ms. Coffman as the non-moving party and "draw[s] all reasonable inferences" in her favor. *Tabor v. Hilti, Inc.,* 703 F.3d 1206, 1215 (10th Cir. 2013). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Tabor,* 703 F.3d at 1215 (quotations omitted).

In *Tolan v. Cotton,* 134 S.Ct. 1861, 1866 (2014), the Supreme Court cautioned that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." The Court stated:

> Considered together, these facts lead to the inescapable conclusion that the court below credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion.

* * *

The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to Tolan's competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.

*Tolan*, 134 S. Ct. at 1867-68.

Further, the court undertakes a *de novo* review when there are questions of proper application of the law. *See Brue v. Gonzales,* 464 F.3d 1227, 1232 (10th Cir. 2006) (reviewing *de novo* whether the district court applied the correct legal standard).

## SUMMARY OF THE ARGUMENT

In this False Claims Act *qui tam* case, Plaintiff-Relator-Appellant Michele Coffman, seeks fraud damages on behalf of the United States arising from City of Leavenworth's failure to properly treat and dispose of wastewater for various government agencies, including the Department of the Army, the Veterans Administration, and the Federal Bureau of Prisons.

Contract language and federal regulations require that contractors treating wastewater from government agencies not only accept wastewater from those agencies, but that they treat it and dispose of it in compliance with federal environmental laws, including the Clean Water Act. The City of Leavenworth contracted with government agencies, took their wastewater, and demanded payment from them. What it did not tell them, though, was that it repeatedly and continuously violated environmental laws by discharging raw, untreated sewage into Five Mile Creek, a tributary of the Missouri River; by discharging other wastewater to Five Mile Creek without a permit; by allowing numerous sanitary sewer overflows; and by dumping and abandoning sewage waste on the ground without the required permits or precautions.

That is, when the City demanded payment, it impliedly and falsely certified that it was complying with its contractual and legal obligations and was entitled to payment, when in fact it was not. The Supreme Court and the Tenth

Circuit (in numerous cases) have recognized a False Claims Act cause of action based on implied false certification. The district court, however, did not follow this precedent, and denied Coffman's motion for partial summary judgment and granted summary judgment to the City. In doing so, the district court improperly applied the guidance from the Supreme Court and this Court regarding implied false certification claims and what makes representations material. The district court also did not view the evidence in the light most favorable to Ms. Coffman, ignoring a large amount of evidence regarding the City's environmental noncompliance.

The district court also improperly applied the materiality and scienter requirements for a FCA claim based on implied false certification. Under the case law in the Supreme Court and the Tenth Circuit, whether a misrepresentation associated with a claim to the government is material must be viewed holistically, in light of all relevant factors, with no single factor being dispositive. The district court instead took a narrow approach to the issue of materiality, focusing on whether specific payment requirements and practices existed. The district court ignored what the Supreme Court and the Tenth Circuit have not ignored: the essence of the bargain, the very reason for the contract. Specifically, the district court ignored the fact that the very reason

for the City's wastewater treatment contracts with the government, was compliance with the Clean Water Act.

The district court's summary judgment order should be reversed, and it should be directed to permit the case to proceed to trial.

# ARGUMENT

## The district court erred in granting summary judgment to the City.

The City of Leavenworth contracted with the Department of the Army and other federal agencies to treat sanitary wastewater. In doing so, it agreed to undertake that service in compliance with environmental laws and regulations, including the Clean Water Act. Although it billed those agencies on a monthly basis, impliedly certifying that it was providing the agreed services and was entitled to be paid, the City in fact was frequently in violation of the environmental laws.

The district court nevertheless denied Coffman's motion for partial summary judgment and granted the City's motion for summary judgment, because "1) none of the underlying service contracts state compliance with the CWA or any other environmental law was a prerequisite to payment; and 2) the bills do not contain any misleading half-truths" in that "Plaintiff presents no evidence to suggest that the City did not treat the wastewater as represented in the monthly bills." A1197-1199. The district court further found that the City's implied certifications were not material and that the City lacked the requisite scienter to support a claim under the FCA.

The district court's conclusion is wrong for four reasons: first, it took a more narrow approach to implied false certification than the Supreme Court took

in *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. 1989 (2016) and than this Court has taken in its other opinions. Second, the district court's ruling ignored a large amount of evidence that the City did not in fact treat wastewater as agreed, and thus did not view the evidence in the light most favorable to Coffman. Third, the district court took a more narrow view of the materiality requirements than the Supreme Court and Tenth Circuit have taken. And fourth, the district court offered no analysis of the scienter requirement and ignored evidence that the City submitted claims for payment with the requisite scienter.

I.    **Coffman can establish a claim under the False Claims Act based on implied certification.**

As shown above, the City agreed in its wastewater treatment contracts with federal agencies that it would accept wastewater from the Department of the Army and others and treat it in accordance with the environmental laws, including the Clean Water Act. As set forth below, Coffman can establish False Claims Act liability based on (1) its invoices to government agencies, which included specific representations about treated wastewater, and (2) the City's violations of the Clean Water Act and other environmental laws, which it did not disclose to the agencies that paid for the service.

## A. Implied certification under *Escobar* and the Tenth Circuit case law.

False claims to the government can be either factually false – such as a false description of goods – or legally false. *United States ex rel. Polukoff v. St. Mark's Hospital*, 895 F.3d 730, 741 (10th Cir. 2018). Legally false claims involve certification of compliance with some contractual or regulatory requirement, and they can involve express certification or, as here implied certification of compliance with such requirements. *See id.*

The Supreme Court formally recognized implied false certification as a basis for False Claims Act liability in *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. 1989 (2016). The plaintiff-relator in *Escobar* asserted a claim after a health care provider sought Medicaid payments even though some of the individual providers were not properly licensed. The Court held:

> the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the good or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

*Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2001.

The Supreme Court in *Escobar* explicitly did not reach the issue "whether all claims for payment implicitly represent that the billing party is legally entitled to demand payment." *Id.*, 136 S.Ct. at 2001. This Court, however, has long recognized not only that a claim under the FCA can be based on implied false certification, but that a mere invoice can form the basis for such a claim. In *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 531-33 (10th Cir. 2000), the defendant billed an amount based on a fixed-price contract, while failing to disclose noncompliance with Medicaid requirements, and accepted full payment. This Court held that because the defendant "submitted invoices for full payment on the contract knowing it had failed to comply with . . . contract requirements," the claim was viable. *Id.* at 533, *citing Ab-Tech Construction , Inc. v. United States*, 31 Fed. Cl. 429, 430 (1994). *See also United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d 1162, 1169 (10th Cir. 2016) ("the pertinent inquiry for implied-false-certification claims is not whether a payee made an affirmative or express false statement, but whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment"); *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168-69 (10th Cir. 2010) (recognizing implied false certification claims arising from environmental violations and pertaining to a waste disposal contract, and reversing district court's dismissal of claim); *United States ex rel. Conner v. Salina Regional Health Center*, 543 F.3d

1211, 1218 (10th Cit. 2008) (reversing the district court's dismissal of FCA implied-certification claim based on improper disposal of hazardous waste).

Other courts have reached similar conclusions. *E.g., United States ex. rel. Pickens v. Kanawaha River Towing,* 916 F. Supp. 702, 706 (S.D. Ohio 1996), *aff'd* 194 F.3d 1314 (6th Cir. 1999) (demand for payment is implied representation of continuing adherence to contract and establishes false claim); *United States ex. rel. Fallon v. Accudyne Corp.,* 921 F. Supp. 611, 627 (W.D. Wis 1995) (The False Claims Act creates a cause of action where a contractor knowingly fails to satisfy the environmental compliance requirements of a government contract but seeks payment as if it has fully performed without disclosing the noncompliance).

Thus, Coffman can establish her FCA claim by showing:

- The City contracted with the government to provide services in compliance with the environmental law;

- The City submitted invoices to the government, implying it was entitled to payment; and

- The City did not disclose its noncompliance with the Clean Water Act or the hazards its disposal practices posed for public health.

Coffman can show these elements.

## B. The City's invoices to the government implied that the City was entitled to payment.

The City submitted monthly invoices to the government for payment under the contracts, and was paid accordingly. A68, A703-704, A1025. In sending those invoices, the City implied that it had satisfied its obligations under the contracts and was entitled to payment. Under this Court's precedent, those invoices alone, aside from any representation they contained, were sufficient to support a claim under the FCA based on implied false certification. *United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.2d at 1169; *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d at 533.

Even under the more narrow circumstances at issue in *Escobar*, the City's invoices were sufficient to support a claim based on implied certification, because they contained specific, affirmative representations. As set forth above, the Supreme Court in *Escobar* held that an implied certification claim may be sustained where the claim for payment makes some affirmative representation if that representation, even if true, is accompanied by an omission that makes the misrepresentation a misleading half-truth. *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2001. The Supreme Court did not reach, as this Court has, a situation where an invoice contains no particular representation but is merely a demand for payment. *Id.* at 2000.

Here, the City made specific representations in its invoices to the federal agencies. Its invoices contained information about its treatment of wastewater, including information about wastewater flow amounts and the portion of the invoice attributable to operation and maintenance expenses. A110-112 ¶¶ 142-150. Entering a full-rate billing amount on these invoices implied that the City had provided the full service for which the government had contracted. Under the contract, full service included the City's obligation under the contracts to "receive, carry, treat and dispose of all sanitary sewage [the Government releases] into Contractor's sewer system and in a manner and by such means as constitutes no hazard to public health." A110, A677-678. The contract further provided that the City "shall operate [its] sewage disposal and treatment facilities in conformity with applicable laws, rules, and regulations promulgated by Federal, state and local authorities." *Id.* (quoting the "Services to be Rendered" section of Defendant's contract.)

Moreover, the reason the City incurred operation and maintenance expenses (which it passed on to the government agencies) was that it was required to treat wastewater in accordance with environmental requirements. Instead, as shown below, the City discharged untreated sewage to Five Mile Creek and committed other environmental violations.

**C. The City's failure to disclose its noncompliance with environmental laws, viewed in the light most favorable to Coffman, made the representations in its invoices misleading half-truths.**

In spite of its monthly invoices to federal agencies implying that it was in compliance with laws relating to treatment of sewage and was entitled to payment, the City committed scores of environmental violations during the limitations period of this lawsuit. These violations included unpermitted discharges of wastewater (some treated, some not) to waters of the United States and improper dumping of septage on the ground near the City's wastewater treatment plant. These violations, combined with the City's requests for payment, which impliedly certified compliance with contractual positions, made the City's invoices "misleading half-truths." *See Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2001.

**1. The City discharged raw, untreated sewage without a permit**

Between August 2010 and November 2011, the City discharged raw, untreated sewage from its wastewater treatment plant to Five Mile Creek, a tributary of the Missouri River, without a permit. In August 2010, the city discovered that a sewer pipe from the wastewater treatment plant and crossing Five Mile Creek, which is adjacent to the facility, had broken and was leaking raw sewage into Five Mile Creek. A683, A711, A749-750, A753-754, A757-760. The

City attempted makeshift solutions, with marginal success, but later acknowledged that a simple solution – capping the pipe to halt the flow – could be undertaken in a matter of days. A92. In November 2011, the City's Deputy Public Works Director stated that "kdhe is now poking around and we will be in big trouble in short order if we don't act." *Id.* (SOF 37)The City then put out a request for a contractor, and within a month, the leaking pipe was capped. SOF 39. The actual work took "a day or two" and cost $7,021. SOF 40-43.

Thus, the city permitted raw sewage to leak into Five Mile Creek, which flows to the Missouri River, for 15 months. This discharge is a textbook example of a Clean Water Act violation. The City's NPDES permit does not allow any discharges of treated wastewater to any body of water other than the Missouri River, and it does not allow discharges of untreated wastewater to any body of water. A380-391, A392-406; *See* 33 U.S.C. § 1342. But as the City's expert witness acknowledged, the leaking, untreated sewage from the pipe leading from the City's wastewater treatment plant was the addition of a pollutant from a point source to waters of the United States without a permit. A738, 740-741. The City's expert was correct, because (1) the leaking sewage constituted the addition of a pollutant to waters. *Id.*; (2) the leaking sewer pipe was a "point source," which is defined to include "any discernible, confined and discrete conveyance, including but not limited to any pipe . . . ." 33 U.S.C. § 1362(14); (3) there is no question that Five

Mile Creek, a tributary of the Missouri River, constitutes "waters of the United States." A783 ¶ 27; and (4) the City did not have a permit to discharge wastewater to Five Mile Creek. *See* A380-391, A392-406.

By discharging raw sewage to Five Mile Creek without a permit from August 2010 to November 2011, the City violated its NPDES permit and the Clean Water Act. And by violating the Clean Water Act, the City violated the explicit language and very essence of the federal contracts during the last five months of 2010 and the first 11 months of 2011.

## 2. The City discharged treated wastewater without a permit

The City also discharged final effluent into Five Mile Creek, in violation of its NPDES permit, which permitted the City to discharge treated wastewater only into the Missouri River. The City made these discharges during the same time period that it was discharging raw, untreated sewage into Five Mile Creek. The City discharged treated wastewater upstream of the broken sewer pipe to improve the smell and appearance of the creek where sewage was being discharged and to "move it downstream." SOF 45.

The City's expert also acknowledged that this discharge, like the discharge from the broken sewer pipe, constituted the addition of pollutants (processed wastewater with concentrations of various pollutants) to waters of the United States (Five Mile Creek) from a point source (a discharge pipe) without a permit.

SOF 48. This discharge, like the discharge from the broken sewer pipe, violated the City's NPDES permit and the Clean Water Act.

### 3. The City failed to prevent sanitary sewer overflows.

In 2015 the City entered a consent order with the Environmental Protection Agency ("EPA") addressing NPDES violations occurring between 2010 and 2014. A780-790. The violations addressed in the order included overflows from sanitary sewers in Leavenworth that made their way to waterways. A739.

Like the City's other unpermitted discharges, these sanitary sewer overflows constituted the addition of a pollutant (raw sewage) from point sources (sewer pipes) to waters of the United States without a permit. The reason for these discharges was that they City failed to operate and maintain its wastewater treatment facilities in accordance with the standards set forth in the City's NPDES permit. A784 ¶ 31.

Thus, these discharges to water – which occurred on 19 occasions between 2010 and 2015 (A783 ¶ 27) – violated the City's NPDES permit and the Clean Water Act.

### 4. The City dumped sewage waste in violation of environmental laws.

The City also dumped untreated septage on the ground outside its wastewater treatment plant. The City collected material, mostly domestic septage, from City sewer lines, transported the material to the wastewater treatment plant,

decanted the water into the plant's headworks, and dumped the remaining material on the ground just outside the wastewater treatment plant's fence. A687-688.

The parties disagree about how the dumped material should be characterized. Coffman's expert opined that the material was properly defined as sewage sludge, which is subject to regulation under 40 CFR 503, which addresses the proper disposal of sewage sludge from wastewater treatment facilities. The City's expert took the position that the dumped material was "grit and screenings," which are solids (such as rags, plastic, and grit) that are separated from a wastewater stream during preliminary treatment.

But for purposes of the False Claims Act, it does not matter whether the dumped material was sewage sludge or grit and screenings. If it was sewage sludge, then the sewage sludge disposal requirements of 33 U.S.C. § 1345 and 40 CFR § 503 (under the Clean Water Act) apply. If the material was grit and screenings, then the 503 regulations do not apply, but the solid waste disposal requirements under 40 CFR § 257 (under the Resource Conservation and Recovery Act ("RCRA")) apply instead. The City did not comply with either set of requirements.

The City did not obtain a Section 503 permit, did not perform any laboratory analysis of the dumped material, did not dispose of the material in a lined pit or restrict access to the dump site in any way. A694-695. Thus, if the

Section 503 regulations are applicable, then the City was not in compliance with those regulations, and its noncompliance meant that its contracts with federal agencies and monthly invoices to those agencies contained false claims.

If, as the City suggests, the dumped material was "grit and screenings," then it was not subject to the Section 503 regulations. *See* 40 CFR § 503.6(h) (excluding grit and screenings). Instead, the material would be regulated under 40 CFR § 257, which pertains to solid waste under RCRA. *See* 40 CFR § 257.1(b) (applying regulations to solid wastes not regulated by 40 CFR 503). *See Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct and Sewer Authority*, 888 F.2d 180 (1st Cir. 1989) (discarded material not from wastewater treatment works was subject to regulation as solid waste).

Thus, under the analysis proposed by the City's expert, disposal of these materials must meet certain requirements under Section 257. For example, a person disposing of the materials must ensure that the dumping will not cause discharge to waters in violation of Section 402 (regulating discharges to surface waters) or Section 404 (regulating fill materials deposited in wetlands) of the Clean Water Act, 33 U.S.C. § 1342, and that the disposed material will not contaminate groundwater. 40 CFR § 257.3-3 and -4. The facility must also minimize disease vectors "through the periodic application of cover material or other techniques as appropriate so as to protect public health." 40 CFR § 257.3-6.

The City did not dispose of the Vactor truck material in a lined pit, post warning signs, restrict access, or analyze the material. SOF 55-57. Because it took no steps to protect public health in connection with its dumping, it did not comply with the requirements of 40 CFR § 257. And because the City did not meet these requirements, its practices constituted "open dumping." 40 CFR § 257.1(a). RCRA provides that the "disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited." 42 U.S.C. § 6945(a). Thus, if the Section 257 regulations are applicable, then the City was not in compliance with those regulations or with the statute, and its noncompliance meant that its contracts with federal agencies and monthly invoices to those agencies contained impliedly false claims.

In addition, Kansas regulations define "[a]ny privy, privy vault, or other place used for the deposit of human excreta which permits animals or insects access to the excreta, which produces foul or objectionable odors, or is located so as to make pollution of a domestic water supply probable" as a "public nuisance hazardous to public health." KAR 28-5-4. The City's Vactor truck dumping fits this regulation precisely: the City deposited human excreta where animals and insects had access. This resulted in complaints from local merchants about the odor from the dump site. SOF 59.

Thus, the material dumped behind the wastewater treatment plant was regulated either by the Clean Water Act or by RCRA, as well as by Kansas environmental regulations. But regardless of which is these laws applies, the City's sewage dumping did not comply, as shown above. As a result, it also did not comply with the requirements of its contracts with government agencies, thus rendering its sewage invoices, which implied entitled to payment based on compliance with environmental laws, misleading half-truths.

### D. The district court's summary judgment ruling took an improperly narrow approach to implied false certification under *Escobar* and the Tenth Circuit case law.

As set forth above, the Supreme Court held in *Escobar* that implied false certification can be a basis for liability when (1) a claim for payment contains a specific representation, and (2) undisclosed information renders that representation a misleading half-truth. *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2001. The district court's order granting summary judgment to the City misapplied both these elements.

First, the district court downplayed the significance of City's demands for payment from the government, stating that "the sewer bills in this case did nothing more than demand payment for the federal agency's percentage of plant flow and the contracted percentage rates for annual operating and maintenance expenses." A1199. As set forth above, however, the City's invoices to the government

contained information regarding the amount of flow the City had treated and the operation and maintenance expenses attributable to the agency, and they demanded payment at the full rate, implying that the City had fully complied with its obligations under the contracts.

More importantly, the district court's holding regarding the City's invoices ignores this Court's case law. *Escobar* did not require that invoices contain specific representations to support a claim for implied false certification, but held only that where claims do contain such representations, a claim can be supported. *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2000-2001. The Tenth Circuit, however, has repeatedly held that merely sending invoices for full payment implies that the contractor has complied with all contractual requirements and is entitled to full payment. *United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.2d at 1169; *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d at 533. The Supreme Court addressed a more narrow issue in *Escobar*, but it expressly did not abrogate broader holdings, such as these Tenth Circuit holdings.

Second, the district court ignored evidence that the City did not disclose its environmental noncompliance to the government. That noncompliance rendered the City's claims for payment misleading half-truths. The district court stated that "[p]laintiff presents no evidence to suggest that the City did not treat the

wastewater as represented in the monthly bills" and that "there is no evidence that the City did not provide the contracted service—treatment of these agencies' sewage" A1199, A1200. In fact, Coffman presented significant evidence that showed that the City did not provide the contracted service and did not treat the agencies' sewage as required in the contracts and as indicated in the monthly invoices. As shown above, the City's obligation under the contracts and under the Clean Water Act was to treat sewage to remove a certain amount of pollutants and then discharge the wastewater to the Missouri River. A677-678, A380-391, A392-406. Instead, the City discharged untreated sewage to Five Mile Creek for a 15-month period, discharged treated wastewater to Five Mile Creek without a permit, allowed sanitary sewer overflows to reach waterways, and dumped and abandoned septage on the ground without obtaining the required permits or taking the required precautions.

In granting the City's motion for summary judgment while ignoring the evidence Coffman presented of these failures to treat the agencies' wastewater as required under the contracts, the district court did not view the evidence in the light most favorable to the nonmoving party. Viewing the evidence in a light more favorable to Coffman would have led the district court to a different conclusion regarding whether the City complied with its contractual obligations. The district court's order granting summary judgment to the City therefore should be reversed.

**II.    The City's misrepresentations to government agencies were material to the government's payment of the City's invoices.**

The district court concluded that the City's failures to inform the government about its environmental violations – the failure that made the City's invoices misleading half-truths – were not material to the government's payment of the City's invoices. The district court erroneously reached this conclusion because it found no evidence that (1) the government considered environmental compliance a condition of payment; (2) the government would have refused to pay if it knew of the City's environmental violations; or (3) the City knew the government would refuse to pay if it knew about the violations. A1199. The district court distinguished this Court's decision in *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d at 1163, another FCA case based on implied false certification regarding environmental violations, because the contract in *Lemmon* required the contractor to report its activities to the government and to maintain an inspection system for government review. A1199-1200.

The district court's conclusion regarding materiality, like its conclusion regarding implied false certification in general, is more narrow than the materiality standard set forth by the Supreme Court in *Escobar*, by this Court in *Lemmon* and other cases, and by other circuit courts of appeal in post-*Escobar* rulings. The case law requires a holistic, fact-specific examination of all factors to determine materiality, which may include inquiry into the nature of the contract

itself. As set forth below, under this analysis, the City's noncompliance with environmental regulations was material.

## A. Standard for Materiality

To support liability under the FCA, a false claim made to the government must be material to the government's decisions to pay. The statute defines "material" broadly as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Thus, under the plain language of the statute, liability does not depend on whether payment decisions are actually influenced by the false claim, but only on whether the type of claim has a "natural tendency to influence" or is "capable of influencing" payment decisions. *Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d at 1170 ("materiality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid," but only that "the government *may* not have paid.") (emphasis by Tenth Circuit); *Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d at 1169 (10th Cir. 2016); *United States ex rel. Conner v. Salina Regional Health Center*, 543 F.3d 1211, 1219-20 (10th Cir. 2008).

The Supreme Court in *Escobar* recognized that "materiality cannot rest on 'a single fact or occurrence as always determinative.'" *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2001,

*quoting Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011). The Court analyzed materiality as other courts and commentators have, citing the materiality standard from the Restatement (Second) of Torts: a matter is material "'(1) if a reasonable man would attach importance to [it] in determining his choice of action in the transaction;' or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action.'" *Id.* at 2002-03, citing Restatement (Second) of Torts § 538, at 80 and Restatement (Second) of Contracts § 162(2). The Court also cited a case holding that a misrepresentation is material if it "went to the very essence of the bargain." *Id.* at 2003 n. 5, citing *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400 (1931); *see United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831 (6th Cir. 2018); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir. 2016).

Ultimately, because materiality depends on a holistic assessment, in many cases it is likely to be a determination for a jury. *Cf.* Restatement (Second) of Torts § 538 (recognizing that a misrepresentation's materiality will often depend on a jury determination of what is reasonable). Accordingly, in *Escobar*, the Supreme Court ultimately held, based on allegations that the impliedly false certifications in *Escobar* were "so central" to the purpose of the contract, that the district court's dismissal of the implied false certification claim was in error.

*Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2004.

In *Escobar*'s wake, several circuits have expressly recognized that the holistic nature of the materiality inquiry can render it inappropriate for resolution as a matter of law, particularly when factors point in different directions. *See United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d at 831-37 (Sixth Circuit, holding that "the analysis of materiality is 'holistic.'"); *United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 904-06 (9th Cir. 2017); *United States ex rel. Badr v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (materiality analysis that considered "common sense" and efforts of the contractor to conceal its noncompliance "perfectly aligns" with the Supreme Court's materiality analysis in *Escobar*); *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109-112 (1st Cir. 2016) (in light of the Supreme Court's decision in *Escobar*, "courts are to conduct a holistic approach to determining materiality in connection with a payment decision, with no one factor being necessarily dispositive"); *United States ex rel. Brooks v. Stevens-Henager College*, 305 F. Supp.3d 1279 (D. Utah 2018) ("Materiality depends on a holistic assessment of many factors"); *Accord United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 660-65 (5th Cir. 2017) (describing the Ninth Circuit's *Campie* and First Circuit's *Escobar* decisions as "well-considered" and

agreeing that a single factor is not normally outcome-determinative as a matter of law).

### B. The City's failure to inform the government that the City had violated environmental requirements was material to payment of the City's invoices.

Looking at the materiality factors in this case holistically and in a light most favorable to Coffman, this Court should conclude either that the City's failure to inform the government of its environmental violations was material to payment under the contracts or that materiality, at a minimum, should be an issue for the jury. This is because (1) a reasonable person could conclude that the City's noncompliance was material; (2) the City knew or should have known that the government viewed environmental noncompliance as material; and (3) environmental compliance was the very purpose of the contracts.

The contracts specifically require environmental compliance. The "Services to be Rendered" section of the City's contract with the Department of the Army states simply, clearly, and unambiguously that the City "shall furnish a sanitary sewer connection and sanitary sewage service as required by the Government and shall receive, carry, treat, and dispose of all sanitary sewage . . . *in a manner and by such means as will constitute no hazard to the public health*" and that the City "shall operate its sewage disposal and treatment facilities in conformity with

applicable laws, rules, and regulations promulgated by Federal, state and local authorities. A110, A677-678 (emphasis added).

The City admitted that compliance with environmental laws is an important contractual requirement. A705-706. The government's requirement and the City's admission of importance strongly suggest that a reasonable person on a jury would attach importance to the requirement that the City operate its sewage treatment and disposal facility in accordance with the laws governing sewage treatment and disposal.

Moreover, the City knew or had reason to know that the federal agencies attached importance to environmental compliance. Not only does the government require environmental compliance in its federal contracts, but federal law requires that environmental compliance be a part of all federal contracts. The Clean Air and Water clause incorporated into the City's contracts is required to be inserted in all government contracts. Executive Order No. 11,738, 38 Fed. Reg. §25161 (Sept. 12, 1973). Likewise, 40 C.F.R. Ch. I § 15.31 provides that:

> Any agency responsible for promulgating contract, grant or loan regulations, shall ensure that its regulations require every nonexempt agency contract, grant, loan and every sub-agreement issued thereunder to include the following provisions:
>
> . . . (c) a promise by the contractor . . . that in the performance of the contract . . . he or she will comply with all requirements of . . . the CWA, including the requirements of . . . section 308 of the CWA, and all applicable . . . clean water standards. See Federal Acquisition

Regulation, 48 C.F.R. §52.223-1 and 52.223-2. (See 40 C.F.R. Ch. I §15.31.)

In assessing materiality, it is appropriate to look not only to the contracts, but to the relevant statutes and regulations. *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 1995; *United States ex rel. Conner v. Salina Regional Health Center*, 543 F.3d at 1218 (in implied certification cases, courts look to "the underlying contracts, statutes, or regulations" to determine materiality). Based on the contracts, the statutes, and the regulations, the City knew or had reason to know that the federal agencies it contracted with attach importance to the whether the City complies with the law in treating the agencies' wastewater.

More fundamentally, compliance with environmental laws is at the core of the City's contracts with the federal agencies; it is the very reason for their existence. If environmental compliance in the treatment and disposal of wastewater were not important to the federal agencies, they could just run a pipe to the nearest waterway without treating the wastewater. Instead, the agencies here contracted with the City to collect, treat, and dispose of their wastewater in compliance with environmental laws. Environmental compliance is required not only in the statutes themselves, but in the contracts and in federal regulations concerning sewage contractors. This Court noted the centrality of environmental compliance as affecting materiality in another FCA case based on improper waste

47

disposal, noting that "Plaintiffs also showed that the violations undercut the purpose of the contracts – the safe and permanent disposal of waste." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d at 1169. The purpose of the contracts here – the safe and permanent disposal of waste – is the same as the purpose of the contract in *Lemmon*, in which this Court found that the district court's dismissal of an implied false certification claim was improper.

The significance of environmental compliance in waste disposal contracts is especially true given the difficulty federal agencies have had with Clean Water Act compliance. The United States Government Accounting Office has found that agencies of the federal government, when treating and discharging their own wastewater, traditionally have had twice the noncompliance rate as that of nonfederal facilities. *United States Department of Energy v. Ohio*, 503 U.S. 607, 630 (1992) (White, J., concurring in part and dissenting in part, noting that "[f]ederal facilities fail to comply with the Clean Water Act  . . . twice as frequently as private industry"). The federal agencies here, rather than attempt to treat and discharge their own wastewater, with the associated risks and expenses, chose to contract with the City to properly treat and dispose of the sewage they generated.

As the Supreme Court described in *Escobar*, the fundamental inquiry regarding materiality is whether a contractor's noncompliance could affect the

government's decisions to pay. Given the government's interest in compliance with federal law, which is a reason for the existence of the contracts with Defendant, a reasonable juror could infer that full knowledge of the City's environmental noncompliance would have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" to the City. *See* 31 U.S.C. § 3729(b)(4). It is, at a minimum, a question for the jury.

## C. The district court applied an improperly narrow standard for materiality.

As set forth above, the district court found materiality lacking because it found no specific evidence that the government considered environmental compliance a condition of payment under the contracts. That holding, and that type of analysis, is more narrow than the holistic approach taken by the Supreme Court in *Escobar* by this Court in *Lemmon*, and by other courts of appeal since *Escobar*.

The district court distinguished *Lemmon* because the contract at issue contained certain reporting and inspection provisions that the contracts here do not. A1199-1200. The facts in *Lemmon*, however, are similar to the facts here. In *Lemmon*, the defendant contracted to handle hazardous and radioactive waste. The plaintiff-relator alleged that the defendant had committed violations of waste-handling regulations, that it was aware of the violations, that it had requested payment from the government, that it had not informed the government of its

49

violations, and that the government had paid the amounts demanded. *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d at 1169. Here, likewise, Coffman alleges that the City improperly handled wastewater after accepting it from the government agencies, that it was aware of its violations, that it requested payment from the government, that it did not inform the government of its violations, and that the government paid the amounts demanded.

In *Lemmon*, the defendant argued that materiality was lacking because no showing had been made that knowledge of the violations would have caused the government not to pay. *Id.* at 1170. This Court disagreed, holding that "materiality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid. Rather, it requires only a showing that the government *may* not have paid." *Id.*, *citing United States ex rel. Conner v. Salina Regional Health Center*, 543 F.3d at 1219-20 (emphasis by Tenth Circuit). In reversing the district court, this Court looked not just to specific contract provisions, but at the plaintiffs' showing "that the violations undercut the purpose of the contracts—the safe and permanent disposal of waste." *Id.* at 1169.

The district court in this case found that materiality was lacking because it found no evidence that the government would refuse to pay if it were aware of the City's environmental violations. A1199. The district court made this finding without any reference to other factors, including that the very purpose of the

contracts here, like the contracts in *Lemmon*, was the safe and proper disposal of waste. Just as this Court reversed the district court in *Lemmon*, it should reverse the district court's summary judgment order here and allow for a more holistic analysis of materiality to be undertaken by a jury.

### III. The City acted with the requisite scienter in submitting claims for payment.

The FCA contains a scienter requirement. It imposes liability for "knowingly" presenting a false claim to the government. 31 U.S.C. § 3729(a)(1)(A). The Act defines "knowing" and "knowingly" as having actual knowledge or acting in deliberate ignorance or reckless disregard of the truth or falsity of the information. 31 U.S.C. 3729(b)(1)(A). A relator need not show specific intent to defraud. *Id.*; *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 1999 n. 2. In granting the City's motion for summary judgment, the district court concluded that the City did not submit its invoices with the requisite scienter to support a claim under the FCA. A1200. The district court offered no analysis of the scienter requirement, and it ignored evidence that the City's claims for payment were made with the requisite scienter.

Scienter can be found within a corporate entity even if there is not a single individual responsible for both compliance and contracting issues. For purposes of the Act, the knowing conduct of a corporation's employees and agents acting

within the scope of their employment is imputed to the corporation. The term "person" applies to corporations, (*See* 1 U.S.C. §1 (1998)) and *respondeat superior* applies to FCA cases. *See United States v. United States Cartridge Co.,* 198 F.2d 456 (8th Cir. 1952), *cert denied*, 345 U.S. 910 (1953).

In *U.S. v. Science Applications Intern. Corp.*, 626 F.3d 1257, 1276 (D.C. Cir. 2010), the D.C. Circuit observed that if a corporate structure prevents an organization from learning of the falsity of its claims, that can show that the organization "acted in deliberate ignorance or reckless disregard of the truth of its claims." *Id.* The district court in that case later held that even having a compliance program in place and making "diligent inquiry" was insufficient to shield defendant from a finding of scienter, and that defendant recklessly failed to know that the claims it had submitted were false. *United States v. Science Applications Intern. Corp.,* 958 F.Supp. 2d 53, 69-70 (D.D.C. 2013).

Here, while the wastewater treatment operators operated the facility and took the actions that violated environmental laws, they were not responsible for submitting invoices to the federal agencies. Rather, the City's finance director testified that the City submitted invoices based only on the agency's level of flow and its portion of operation and maintenance costs. A1025. This is the kind of corporate structure the court in *Science Applications Intern. Corp.* described. The district court did not discuss any evidence that it made a "diligent inquiry," or any

inquiry, of its wastewater treatment plant to ensure compliance before submitting invoices to the government for payment. And in fact, the City presented no such evidence.

The "Description of Work" paragraph of the City's contract with the Army provides that the City "shall receive, carry, treat, and dispose of all sanitary sewage . . . in a manner and by such means as will constitute no hazard to the public health" and that the City "shall operate its sewage disposal and treatment facilities in conformity with applicable laws, rules, and regulations promulgated by Federal, state, and local authorities. A678. The City contends that this language was not material to the contract. But the City has admitted that compliance with environmental laws is an important contractual requirement. A706.

The contract language requiring environmental compliance is unambiguous, but, as shown above, the City did not comply with environmental laws in numerous instances. If the City believed the language was unclear or was unclear whether the government believed the requirement was important, it had an obligation to make at least a limited inquiry to ascertain the government's requirement or expectation. *United States v. Takea Extrusions, LP*, 341 F.3d 843, 845 n.2 (8th Cir. 2003), *citing United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 768 (8th Cir. 2002); *United States ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.* 276 F.3d 1032, 1053 (8th Cir.

2002); s*ee also Heckler v. Community Health Servs.,* 467 U.S. 51, 64 (1984). But there is nothing in the record to show that the City ever inquired of the Army whether this requirement was material to the Army. Nor is there any evidence that the City informed the Army (or any other agency with which it contracted) of its environmental violations. A724.

Common sense can establish one's scienter that contractual requirements are material. *United States ex rel. Badr v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017). Efforts to conceal noncompliance likewise can establish one's scienter that environmental compliance was material. *Id.* Here, the fact that environmental compliance was the very essence of the contracts for wastewater treatment can establish scienter that environmental compliance was material. And the City's admission that compliance with environmental laws is an important contractual requirement further establishes the City's scienter. A706.

Moreover, as noted above, Congress amended the False Claims Act's scienter requirement in 1986, making clear that a Relator need not show specific intent to defraud and that "knowing" violations include false claims based on deliberate ignorance or reckless disregard for the truth. Contractors have affirmative obligations to ascertain the truthfulness of claims they submit, and liability may attach to contractors who ignore or fail to inquire about noncompliance with contract requirements.

In these circumstances – where the City unilaterally decided that the requirement was not material (even though it admitted under oath that compliance with environmental laws is an important contractual requirement), repeatedly and continuously failed to comply with environmental requirements, did not inquire whether the government thought the requirement was important, and did not inform the government of its violations – a reasonable juror could conclude that the City had the scienter that the government saw the requirement as material. And because the City had the requisite scienter as to materiality while failing to make even basic inquiries about whether the City was in compliance with environmental obligations before creating each invoice, the City acted with deliberate ignorance or reckless disregard for the truth (scienter) when submitting "knowingly false" monthly claims to federal agencies. Thus, the scienter requirement presents, at a minimum, a question for the jury.

## CONCLUSION

The City of Leavenworth submitted invoices to the government for treating wastewater, but those invoices impliedly and falsely certified that the City was treating the wastewater in accordance with contractual requirements and the environmental laws. That requirement was the core of the City's wastewater treatment contracts with the government, and it was material to the government's payment of the invoices. At a minimum, these issues should be presented to the jury. The district court's order granting summary judgment to the City on Coffman's FCA implied false certification claim should be reversed.

Dated: October 1, 2018

Respectfully submitted,

By */s/ Mark V. Dugan*
MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com

*Attorneys for Plaintiff-Relator-
Appellant Michele Coffman*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is desired. This appeal raises important issues under the False Claims Act concerning claims based on implied false certification,

Dated: October 1, 2018

Respectfully submitted,

By */s/ Mark V. Dugan*

MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com

*Attorneys for Plaintiff-Relator-*
  *Appellant Michele Coffman*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

a)   this Brief contains 11,579 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

b)   this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, in Times New Roman 14-point font.

Dated: October 1, 2018

By */s/ Mark V. Dugan*  
MARK V. DUGAN  
HEATHER J. SCHLOZMAN  
DUGAN SCHLOZMAN LLC  
8826 Santa Fe Drive, Suite 307  
Overland Park, Kansas 66212  
(913) 322-3528  
mark@duganschlozman.com  
heather@duganschlozman.com  

ROBERT COLLINS  
COLLINS LAW OFFICE, LLC  
P.O. Box 4786  
Olathe, Kansas 66063  
(913) 538-7472  
robert@collingslegal.com  

*Attorneys for Plaintiff-Relator-*  
*Appellant Michele Coffman*

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)     All required privacy redactions have been made per 10th Cir. R. 25.5;

(2)     The hard copies that have been submitted to the Clerk's Office are exact copies of the ECF Filing; and

(3)     The ECF submission have been scanned for viruses with the most recent version of Security Manager AV Defender v. 6.6.2.49 (last update 9.28.2018) and, according to the program are free of viruses.

Dated: October 1, 2018

By */s/ Mark V. Dugan*
MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collingslegal.com

*Attorneys for Plaintiff-Relator-
    Appellant*

## CERTIFICATE OF SERVICE

I certify that, on October 1, 2018, I caused the forgoing brief to be electronically filed with the Clerk of the Court using the CM/ECF system, which provides notification of such filing to all counsel of record.

By */s/ Mark V. Dugan*
MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collingslegal.com

*Attorneys for Plaintiff-Relator-*
*Appellant Michele Coffman*

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

THE UNITED STATES OF AMERICA *ex rel.*
MICHELE COFFMAN,

      Plaintiff-Relator,

      v.

THE CITY OF LEAVENWORTH, KANSAS,

      Defendant.

Case No. 14-2538-JAR

## MEMORANDUM AND ORDER

Plaintiff-Relator Michele Coffman filed this qui tam action against Defendant the City of Leavenworth, Kansas ("the City"), alleging that it committed fraud on the federal government by making a false claim for reimbursement to the Federal Emergency Management Agency ("FEMA") and fraudulently billing federal agencies for sewage service. This matter is before the Court on the parties' cross motions for summary judgment (Docs. 92 and 94). The motions are fully briefed and the Court is prepared to rule. For the reasons stated below, the Court denies Plaintiff's motion for partial summary judgment and grants in part the City's motion for summary judgment.

## I.    SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom

---

[1] Fed. R. Civ. P. 56(a).

in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material

fact unless the evidence, construed in the light most favorable to the non-moving party, is such

that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if,

under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A

dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of

fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact

and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant

who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's

claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant

on an essential element of the nonmovant's claim.[7]

Once the movant has met the initial burden of showing the absence of a genuine dispute

of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that

there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings

to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be

---

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9] *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[11]  To successfully oppose summary judgment, the nonmovant must bring forward more than a mere scintilla of evidence in support of his position.[12]  A nonmovant may not create a genuine issue of material fact with unsupported, conclusory allegations."[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy, and inexpensive determination of every action."[14]  "Where, as here, the parties file cross-motions for summary judgment, [the Court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[15]  The Court considers cross-motions separately: the denial of one does not require the grant of the other.[16]  "To the extent the cross-motions overlap, however, the Court may address the legal arguments together."[17]  The material facts are undisputed in this case, and the legal issues asserted in both motions overlap.  The Court will therefore address those issues together.

---

[10] *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[11] *Adler,* 144 F.3d at 671.

[12] *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993).

[13] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006).

[14] *Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15] *James Barlow Family Ltd. P'ship v. David M. Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

[16] *Buell Cabinet Co. v. Sudduth,* 608 F.2d 431, 433 (10th Cir. 1979).

[17] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (quotations omitted).

## II.     UNCONTROVERTED FACTS

The following material facts are either uncontroverted or, if controverted, are construed in the light most favorable to the nonmovant.

### A.     The Parties and Relevant Entities

The City is a municipal government in the State of Kansas.  It operates a wastewater treatment plant (the "WTP") that provides sewage and wastewater treatment services for its residents.  It also provides wastewater treatment services to the Veterans Administration ("VA"), the United States Army ("Army"), and the United States Department of Justice Bureau of Prisons ("BOP") pursuant to contracts it has with these federal agencies.  The City entered into contracts with the Army and the BOP for sewage service in 1974, and with the VA in 1978.

At all times relevant to this litigation, Charles Klingler was the WTP's Superintendent, Michael McDonald was the City Engineer and Director of Public Works ("Public Works Director"), and Scott Miller was the City Manager.  Chad Lough was the WTP's Assistant Superintendent from July 22, 2010 until June 20, 2012.

Plaintiff worked at the WTP from 2010 to 2013.  She began as a Class I Operator, rose to the rank of Assistant Superintendent, and resigned after being demoted to a Class II Operator. She filed this qui tam action, alleging, *inter alia*, she was constructively discharged after she began asking questions about billing irregularities.

### B.     Regulatory Overview

The Clean Water Act prohibits "the discharge of any pollutant by any person" into waters of the United States, except in accordance with certain provisions of the Act.[18]  To comply with

---

[18] 33 U.S.C. § 1311(a).

the Act, pollutant dischargers can obtain a permit through the National Pollutant Discharge

Elimination System ("NPDES") permit program, administered by the Environmental Protection

Agency ("EPA") and authorized states.[19]  "NPDES permits impose limitations on the discharge

of pollutants, and establish related monitoring and reporting requirements, in order to improve

the cleanliness and safety of the Nation's waters."[20]  "Noncompliance with a permit constitutes a

violation of the Act."[21]

  The EPA delegated to the Kansas Department of Health and Environment ("KDHE")  the

authority to regulate wastewater discharge in the state of Kansas.[22]  The KDHE issues the

NPDES permits in Kansas and monitors compliance with the permits.

  During the relevant period, the City held two NPDES permits, one effective from 2008

through 2012, and the other effective from January 2013 through 2017.  These permits allowed

the City to discharge treated effluent from its wastewater treatment plant into the Missouri River.

Under both NPDES permits, the City was required to report all bypasses to KDHE.  A "bypass"

is an intentional or unintentional diversion of a waste stream from any portion of a treatment

facility.

  Standard Condition 8 of the City's 2008 NPDES permit required the City to "at all times

maintain in good working order and efficiently and effectively operate all treatment, collection,

control systems or facilities to achieve compliance with the terms of this permit . . . ."[23]  Standard

Condition 6 of the 2013 permit required the City to "at all times properly operate and maintain

---

[19] 33 U.S.C. § 1342(a)–(b).

[20] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000).

[21] *Id.*; *see* 40 C.F.R. § 122.41(a).

[22] Doc. 95 at 19.

[23] Doc. 93-14 at 11.

all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the requirements of this permit and Kansas and Federal Law."[24]

### C.    The Broken Sewer Line

On or around August 25, 2010, WTP operators discovered a break in a sewer line that crosses Five-Mile Creek in front of the WTP, between manholes AAB and ABA (also referred to as manholes 4284 and 4268).  Then Assistant Superintendent Chad Lough reported the break to KDHE on August 25, 2010.  His report stated: "Erosion caused large sections of concrete to slide down the hill and damage [the] pipe crossing the creek."[25]  Under "Date Bypass Ended," Lough marked "N/A."[26]

In response to the break, Superintendent Klingler directed operators to place an inflatable plug into the pipe inlet at Manhole AAB to stop backflow from the manhole from entering the line and escaping into the creek.  The inflatable plug ruptured at some point and was replaced by sandbags.

On August 27, 2010, EPA representative Mike Boeglin called Public Works Director McDonald to discuss a citizen complaint about the broken line.  McDonald told him the City was aware of the break, had reported it to KDHE, and had already undertaken efforts to plug the line.

On August 28, 2010, KDHE environmental scientist Vic Montgomery met with Superintendent Klingler at the WTP to inspect the broken pipe.  Montgomery directed Klingler to discharge treated effluent from the final clarifiers into the creek to improve the smell and color

---

[24] *Id.*at 21; Doc. 95-7 at 10.

[25] Doc. 93-3 at 4.

[26] *Id.*

of the creek.  Montgomery considered the effluent discharge not a violation of the City's NPDES permit.

On or about October 8, 2010, KDHE district engineer Helen Holm inspected the WTP for compliance with the City's NPDES permit.[27]  In her inspection report, she indicated, in pertinent part, that: 1) the laboratory data indicated compliance with permit effluent limitations since the last inspection, and 2) the City had reported all bypasses properly.[28]

On November 17, 2010, KDHE representative Chris Seeds sent Assistant Superintendent Lough an e-mail asking about the status of the broken line.  Lough responded:

> The bypass report dated . . . 8/25/10 was for the creek crossing located at the east side of our facility.  This bypass was not a planned bypass.  The pipe that crosses the creek is damaged.  Flow from that line upstream is minimal (only one business on that service and it's an asphalt production plant).  On our side of the creek[,] there are 35-50 sand bags in place in front of the line minimizing flow back towards the creek.  This project is currently under review for repair and or replacement of the pipe that crosses the creek.[29]

WTP operators were unable to successfully "camera" the broken line to determine the exact location of the break until January 25, 2011.  In February 2011, the City contracted with Water Resource Solutions to prepare a design study for use in the project to repair the broken line and re-stabilize the creek bank.

In April 2011, the City received notice from the Army Corps of Engineers that it would experience flooding.  The City undertook certain mitigation measures in anticipation of the flood to prevent damage to the WTP.

---

[27] Doc. 93-8 at 15, Sections VII and IX.

[28] *Id*. at 19.

[29] Doc. 93-3 at 7.

On June 7, 2011, Seeds asked Lough if the broken line had been repaired.  Lough responded on June 13, "This repair has not been completed.  I do believe that there are some proposals/plans available from the Engineering Dept. or Charles Klingler . . . ."[30]

On November 17, 2011, Linaweaver Construction capped the broken line by filling it with concrete.  The work to cap the pipe took "a day or two."[31]  Following this repair, the sewer line no longer leaked.  The City notified KDHE the same day that the bypass had ended.  The City paid $7,021.00 for the repair.

### D.    Submissions to FEMA

From May 19, 2011 to June 14, 2011, the Missouri River flooded due to record snow and rainfall.[32]  On September 23, 2011, FEMA declared the 2011 Missouri River flood to be a "Major Disaster," and designated the incident as "Kansas Flooding (DR-4035)."[33]  Following a natural disaster, FEMA representatives work with cities to prepare a standardized "Project Worksheet" ("PW") document that FEMA prepares as part of a formal request for reimbursements.[34]

Kansas Department of Emergency Management ("KDEM") project specialist Les Money acted as the liaison between the City and FEMA, and was responsible for gathering the information compiled by FEMA for the PW.  On December 11, 2011, FEMA representative Thomas Montgomery sent Les Money an email advising of his decision to include the broken sewer line in the PW and asked for: 1) a description of work completed; 2) copies of invoices for

---

[30] *Id*. at 10.

[31] Doc. 95 at 10, ¶ 40; Doc. 97, ¶ 40 ("Uncontroverted for purposes of this motion").

[32] Doc. 93-10 at 5; https://en.wikipedia.org/wiki/2011_Missouri_River_Flood (February 28, 2018).

[33] Doc. 91 at 4, Pretrial Order, Stipulations ¶ 15.

[34] Doc. 98 at 9, ¶ 38.

work completed; 3) manhole numbers at each end of the break; 4) size of the damaged pipe; 5) length of pipe to replace; 6) brief description of repair/replacement process; and 7) estimated cost of repair/replacement.[35]  Montgomery's request was forwarded to Superintendent McDonald, who responded via email on December 12, 2011.

City Finance Director Dan Williamson decided not to submit a claim for repairs to the broken sewer pipe because that project had been on the City's improvement list prior to the flood.  Ultimately, on December 13, 2011, the City submitted a claim to FEMA requesting $22,966.73, which was the cost of: 1) removing debris in the bar screen building; 2) removing excessive grit in the clarification chamber building; and 3) unclogging sewer lines in approximately 20 locations.[36]

### E.    Plant Maintenance

The WTP consists of primary clarifiers, trickling filters, final clarifiers, holding tanks for sludge, a belt press to dewater sludge, and a UV treatment building.  The WTP utilizes three large vertical towers called "trickling filters," which contain microorganisms utilized in the wastewater treatment process.  At some point in 2012, operators discovered that the bearings in Trickling Filters #1 and #2 were deteriorating, which periodically caused the distributor arms to stop turning.  This, in turn, periodically caused water from inside the filters to escape through the bottom air vent, which was a bypass event.

Trickling Filter #1 was eventually taken out of service because parts necessary to repair it were unavailable.  The WTP placed Trickling Filter #2 on an aggressive maintenance schedule. Following implementation of the maintenance schedule in July 2013, there were no further

---

[35] Doc. 93-11 at 1.

[36] Doc. 93-10 at 5.

bypasses.  KDHE district engineer Helen Holm made specific note of the issues with Trickling Filters #1 and #2 in her December 2014 inspection report, and determined that because the City had properly notified KDHE of the issues and was attempting to remedy them, the City was not in violation of Standard Condition 6 of its NPDES permit.  Plaintiff's expert disagrees with Holm; he believes the City violated its 2008 permit any time a piece of equipment used in the treatment process malfunctioned and was unable to be fixed within a matter of a few days.[37]

The WTP's holding tank mixers also experienced mechanical issues.  Without operational mixers, the heaviest parts of the sludge sat at the bottom of the holding tank, while the lighter parts remained at the top.  Consequently, sludge being processed by the belt press was inconsistent.  After October 2013, the City replaced the mechanical mixers with an air bubbling system.  The broken mixers had no effect on the City's compliance with its NPDES permit.  Plaintiff's expert opines that the City's failure to promptly repair or replace the mixers constituted a violation of the 2008 and 2013 permits.

**F.    The Vactor Truck and Improper Dumping**

The City owns a large industrial truck equipped with a high-pressure water jet cleaning system, as well as a vacuum system for clearing out objects (the "Vactor Truck").  When the vacuum component was used, operators drained some, but not all, of the truck's liquid contents into a manhole inside the plant for processing.  From approximately 2007 to some point in 2012, operators deposited the solids and whatever liquid remained in the truck on the ground in one of two areas behind the gates of the WTP.  Solids from the truck typically consisted of items such as personal hygiene products, plastic razors, gravel, rocks, and raw septage.

---

[37] Doc. 98 at 13, ¶ 13.

The area where solids were dumped was not enclosed, was not a lined pit, and contained no warning signs.  The City never performed any laboratory analysis on the dumped material. The City did not inform the Army, the VA, or the BOP of its practice of dumping materials from the Vactor truck.

At some point, WTP operator Kris Bennetts called KDHE with concerns about the above procedure.  According to Bennetts, KDHE's response was that the procedure he described was "no big deal" and was "an affirmation of this is not as big as what I'm thinking it is."[38]

KDHE inspector Vic Montgomery performed a plant inspection on April 4, 2012.  He observed operators dump the contents of the Vactor truck on the ground, before being removed. In his inspection report, Montgomery noted: "Vac trucks are dewater[ed] then the septage is dumped on the ground to be processed, please make sure to check that water does not migrate from the area."[39]  In a letter accompanying the report, Montgomery clarified, "Solids [from the Vactor truck] are being collected and handled properly but please make sure any excess water does not migrate from the site."[40]

Public Works Director McDonald first learned about the operators' practice of depositing the solids from the Vactor truck on the ground around the time he reviewed KDHE's 2012 inspection report.  During the preliminary treatment process, wastewater passes through a large grate, referred to as a bar screen, which is designed to catch large items such as plastics or rags. These items, referred to as "screenings," are then typically placed into a bin to dry, before being sent to a landfill.  Scott Huismann, Plaintiff's expert, has expressed the opinion that the contents

---

[38] Doc. 93-7, Dep. of Bennetts, 140:6-17.

[39] Doc. 93-6 at 13.

[40] Doc. 93-6 at 5.

of the Vactor truck were "sewage sludge," which, under 40 C.F.R. Part 503, was allowed to be dumped on the ground for up to two years without restriction or control.  Although Huismann did not visit the site where the Vactor truck solids were allegedly dumped, he believes some of the material deposited on the ground may still remain there, in violation of 40 C.F.R. Part 503. Huismann admitted the distinction between preliminary treatment and removal of the Vactor truck solids was confusing and unclear, and could lead an operator to mistakenly equating the two.

### G.   Plaintiff's Employment

Plaintiff began working at the WTP on April 29, 2010, as a Wastewater Treatment Class I Operator.  Superintendent Klingler exempted Plaintiff from carrying an "on call" pager and sent her to training.  She became a Level II Operator on June 23, 2011.  In January 2012, she was appointed to be the project representative for the construction of the UV Building.  In 2012, the City selected her as the "Employee of the Second Quarter."  In December 2012, she received the City's award for "Employee of the Year."

On August 16, 2012, Plaintiff was promoted to Assistant Superintendent.  Upon her promotion, Klingler became her direct supervisor.  She was also informed that she was required to pass the KDHE Class IV certification exam within twelve months, and that her failure to do so would result in demotion or termination.  KDHE's Class IV certification exam had a pass rate of approximately 33 percent at that time.

On March 26, 2013, City Manager Miller met with Plaintiff to discuss concerns raised by James Bennetts, a WTP operator, who had just resigned and raised concerns about operations at the WTP and unfair treatment by Klingler.  The parties disagree about what was discussed at this meeting.  Plaintiff says she told Miller that she believed the City had submitted a fraudulent

claim to FEMA regarding the broken Pipe.  Miller says she did not talk to him about a fraudulent claim to FEMA.  He says their discussion was about Klingler's management style and operation issues at the plant.

On April 1 and 2, 2013, Miller visited the plant, talked to Klingler, and interviewed several other employees.  On April 3, 2013, Klingler told Plaintiff that he would be busy with other things and she should contact him about plant-related matters by email.

On April 16, 2013, Klingler wrote a memo to Plaintiff about four issues: 1) the failure to follow bypass guidelines on April 1, 2013; 2) a request for a timeline regarding a complaint call; 3) new trickling filter procedures; and 4) a request for documentation for sick leave taken on March 18 through March 20, 2013 (the "Memo").[41]  Plaintiff responded to the memorandum by email on April 18, 2013.  She addressed each issue and concluded with the following sentence, "I feel the Memo you gave me on 4/16/2013 is not justified and I will be contacting your Supervisor, Mr. Bob Patzwald, to discuss this issue with him."[42]

On April 18, 2013, Public Works Director McDonald met with Klingler to address concerns about his management style.  McDonald directed Klingler to focus on listening to staff, communicating his expectations clearly, and allowing staff to do their jobs.

On April 19, 2013, Plaintiff met with Klingler and McDonald to discuss her response. McDonald told Coffman he had assisted Klingler in drafting the memo, and reiterated it had been sent for training.  Plaintiff responded that she felt the memo had been sent as retaliation for

---

[41] Doc. 93-17 at 12.  In her response to the City's motion for summary judgment, Plaintiff described Klingler's memorandum dated April 16, 2013, as "a 'training' memorandum filled with minor nitpicky 'training' items."  Doc. 98 at 57.

[42] Doc. 93-18 at 3.

meeting with Miller, which McDonald denied.  The parties dispute what was said at the meeting.
The meeting ended with Plaintiff asking to speak with City Manager Miller.

After this meeting, Plaintiff began receiving weekly "To Do" lists from Klingler, which
contained tasks to be completed in addition to everyday operations.  The items on the "To Do"
lists fell within the scope of Plaintiff's job duties, but Plaintiff believes the lists included
unnecessary work because Klingler never followed up on them.  She also believes this was a
scheme to cause her to work long hours to prevent her from studying and passing the Class IV
exam.

On June 12, 2013, Plaintiff met with Klingler and Lona Lanter, the Director of Human
Resources ("HR Director"), regarding what would happen if she failed to pass the Class IV
exam.  Plaintiff had taken the Class IV exam in December 2012 and on May 9, 2013, failing both
times.  Lanter suggested Plaintiff take the Class III test as a "fall back."  Plaintiff rebuffed the
idea.  She complained of retaliation and explained that her increased workload, which was filled
with meaningless tasks, made it impossible for her to study for either tests.  The City agreed to
extend the deadline from August 16, 2013 to August 29, 2013, which would allow her to take the
test scheduled on the 29th if necessary.

On August 2, 2013, Plaintiff took the Class IV exam again and failed.  On August 8, she
asked Klingler to extend the Class IV certification deadline from 12 months to 18 months.[43]  On
August 16, Klingler denied the request, stating the City had already agreed to extend the deadline
to the end of August 2013.[44]

---

[43] Doc. 93-19 at 1.

[44] *Id.* at 2.

On August 16, 2013, Klingler also presented Plaintiff with her first performance evaluation as assistant superintendent. On a scale from 0 (lowest) to 2 (highest), Klingler rated Plaintiff's performance as a "1," defined to mean "[a] totally competent employee," "[a] good steady contributor," and "[a]n employee that completes all stated job requirements in a timely and efficient manner" on each of the ten categories of review.[45] Based on her evaluation, Coffman received a two percent raise, the highest performance-based raise during her tenure with the City.

Plaintiff appealed Klingler's denial of her requested extension and her evaluation scores to Public Works Director McDonald and HR Director Lanter. Both McDonald and Lanter affirmed Klingler's decisions. McDonald explained that it was the City's policy not to extend certification deadlines other than for a few days to meet a testing schedule, which was exactly what the City did when it extended her deadline from August 16 to August 29.[46] As for her evaluation scores, McDonald concluded that he had no reason to change them because: 1) a rating of 2 required additional documentation, and 2) expectations for a management position are different than for a regular worker.[47] Lanter stated that Klingler's denial of her extension was "a consistent application of the related criteria used for all employees within [the plant]," and that performance evaluations were not grievable.[48]

On September 3, 2013, KDHE notified the City and Plaintiff that she had failed the August 29th Class IV exam. On September 12, 2013, the City notified Plaintiff she had been

---

[45] Doc. 93-22.

[46] Doc. 93-19 at 5.

[47] *Id*. at 5–6.

[48] Doc. 93-19 at 8.

demoted to Operator II for failing to pass her KDHE Class IV certification exam within 12

months of her promotion.  Plaintiff submitted her letter of resignation on October 4, 2013.

### H.    Billing to Federal Agencies

Ruby Maline is the City's Finance Director.  Effective July 1, 1995, the City renewed its

1974 contract with the Army for the provision of sewage service, which is still in effect.  The

"Sewage Service Specifications" section of the contract states:

> SERVICE TO BE RENDERED.  The [City] shall furnish a
> sanitary sewer connection and sanitary sewage service as required
> by the Government and shall receive, carry, treat, and dispose of
> all sanitary sewage originating at the project in such amounts as
> the Government desires to release into Contractor's sewer system
> and in a manner and by such means as will constitute no hazard to
> the public health.  The [City] shall operate [its] sewage disposal
> and treatment facilities in conformity with applicable laws, rules,
> and regulations promulgated by Federal, state and local
> authorities.[49]

Each month from at least 2008 to present, the City has sent the Army an invoice for sewage

service.  The amount billed is based on three components: (a) annual operating and maintenance

expenses; (b) overhead; and (c) reserves for repair and replacement.

The "annual operating and maintenance expenses" component has three sub-parts: (1) the

total budget for operating the treatment plant for the current year, multiplied by the Army's

percentage of plant flow; (2) the total budget for operating the collection system for the current

year, multiplied by a percentage specified by the contract; and (3) adjustments to account for the

difference between the Army's share of the prior year's budget and the actual amount spent

during the prior year to operate the treatment plant and collection system, which is then prorated

over 12 months.  Because the Army receives a credit for any amount budgeted but not spent, the

---

[49] Doc. 93-28 at 16; Doc. 98 at 31–32.

City does not retain money from the Army that is budgeted for the operation of the treatment plant or collection system, but not spent.  The "overhead" component of the bill is calculated, pursuant to the contract, at 13 percent of the Army's annual charge for budgeted treatment plant and collection system expenses, subject to the same adjustment to account for the difference between budgeted and actual costs for the prior year, and then prorated over 12 months.  The "reserves for repair and replacement" component is calculated at 21 percent of the replacement value of the treatment plant, divided by a projected useful life of 25 years and then prorated over 12 months.

On August 1, 1978, the City entered into a contract with the VA to provide it sewage services, which is still in effect today.  An addendum to the VA contract states that the City agrees to comply with Section 308 of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.) "relating to inspection, monitoring, entry, reports, and information, as well as other requirements specified in . . . section 308 of . . . the Water Act . . . and all regulations and guidelines issued thereunder before the award of this contract."  However, the section is preceded by the following language:

> (Applicable only if the contract exceeds $100,000 or the contracting officer has determined that orders under an indefinite quantity contract in any one year will exceed $100,000, or a facility to be used has been subject of a conviction under the Clean Air Act (42 U.S. 1857c-8(c) (1) or the Federal Water Pollution Control Act (33 U.S.C. 1319(c)) and is listed by the EPA, or the contract is not otherwise exempt.)[50]

On November 15, 1974, the City entered into a contract with the BOP to provide it sewage services, which is still in effect today.  The VA and BOP's monthly bills are calculated as a percentage of the total actual operating expenses, derived from each entity's flow readings.

---

[50] Doc. 93-32 at 11; Doc. 98 at 33–34.

17

Each month from 2008 to present, the Army, VA, and BOP have paid their monthly sewage bills in full.  At no time from 2008 to present have any of these federal agencies declined to pay the full amount billed.  At no point from 2010 to 2014 has the Army, VA, or BOP ever requested or performed an audit of the WTP to ensure the City was operating in conformity with its NPDES permit.

## III.    DISCUSSION

The City seeks summary judgment on all five counts: Count I, violations of the Federal False Claims Act ("FCA"); Count II, violations of the anti-retaliation provision of the FCA; Count III, Whistleblower Retaliation under Kansas common law; Count IV, Common Law Retaliatory Discharge; and Count V, Negligent Infliction of Emotional Distress.[51]  Plaintiff seeks summary judgment as to Count I only.  The Court discusses each count separately.

### A.    Count I – False Claims to Government Agencies

The FCA "covers all fraudulent attempts to cause the government to pay out sums of money."[52]  The FCA's qui tam provisions permit a private plaintiff to bring civil actions on behalf of the government.[53]  And while the government "may intervene and take over a private plaintiff's case, it often declines to do so."[54]  If the government declines to intervene, a private plaintiff may proceed as a relator on behalf of the government.[55]  A relator is entitled to a portion of any civil penalty and damages awarded.[56]

---

[51] Doc. 91, Pretrial Order at 2–3.

[52] *United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1172 (10th Cir. 2007).

[53] 31 U.S.C. § 3730(b).

[54] *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010).

[55] 31 U.S.C. § 3730(d)(2).

[56] *Id.*

The FCA, in pertinent part, makes any person liable who "knowingly presents, or causes to be presented, a false or fraudulent claim for approval,"[57] or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[58] Knowledge or scienter is an essential element for all FCA violations.  The FCA defines "knowing" and "knowingly" to mean "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required."[59]  "For a statement to be knowingly false, it must be more than merely an innocent mistake or misinterpretation of a regulatory requirement."[60]

> The FCA recognizes two types of actionable claims—factually false claims and legally false claims.  In a run-of-the-mill "factually false" case, proving falsehood is relatively straightforward:  A relator must generally show that the government payee has submitted "an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  [*Mikes v. Straus*, 274 F.3d 687, 97 (2nd Cir. 2001)].  By contrast, in a claim based on an alleged legal falsehood, the relator must demonstrate that the defendant has "certifie[d] compliance with a statute or regulation as a condition to government payment," yet knowingly failed to comply with such statute or regulation.  *Id.*[61]

Materiality is a requisite element for factually false claims under 31 U.S.C. § 3729(a)(1)(B) and false certification claims.[62]  The FCA defines materiality to include facts

---

[57] 31 U.S.C. § 3729(a)(1)(A).

[58] 31 U.S.C. § 3729(a)(1)(B).

[59] 31 U.S.C. § 3729(b).

[60] *United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998).

[61] *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1217 (10th Cir. 2008).

[62] 31 U.S.C. § 3729(a)(1)(B); *Conner*, 543 F.3d at 1219, n.6 (explicitly adopting a materiality requirement in the context of false certification claims but declining to address whether materiality is an element of other theories of FCA liability).

that have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[63]  "The materiality standard is demanding."[64]

Count I alleges the City submitted false claims for two types of payment: 1) a claim for flood damages to FEMA, and 2) monthly bills for wastewater services to the VA, Army, and BOP.  The FEMA-claim falls under the factually false theory, while the monthly wastewater bills present a legal falsity.[65]

### 1.  False Claim to FEMA

Plaintiff asserts the City submitted two documents to FEMA that contained false statements: 1) an email dated December 12, 2011 (the "Email"), and 2) the Project Worksheet.

### a)  The Email

Plaintiff claims the Email violated 31 U.S.C. § 3729(a)(1)(B) because it contains a false explanation regarding the source of the damage to the Pipe.[66]  She argues that by providing the costs to repair the Pipe and stabilize the river bank, the Email supported the false statement that the Flood broke the Pipe.  The Court disagrees.

The Email, in pertinent part, states:

> The 10" sewerline between Manholes 4284 and 4268 crossed Five Mile Creek in a concrete encased structure.  The creek had eroded sufficiently that the structure had become a "waterfall[.]"  City staff had explored a variety of repair strategies that would have been programmed into a future CIP [capital improvements project] program.
>
> The 2011 Flood submerged this structure and subjected it to unusual forces.  The structure became unstable and essentially

---

[63] 31 U.S.C. § 3729(b)(4).

[64] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016).

[65] *See Conner*, 543 F.3d at 1217.

[66] Doc. 95 at 29–30.

> "broke" at the outside of MH 4268.  This allowed substantial inflow to enter the plant, and created other operational difficulties.  Efforts to stop[] the flow from inside MH 4268 proved only marginally effective.  Once the water receded[,] a contract was issued to Linaweaver Construction to remove the broken sewer crossing and seal the two manholes.  This work cost $7021 on PO 4478.
>
> This solves the immediate concerns over inflow.  There are a very small number of users upstream of MH 4284, and the City will use the vacuum truck periodically to remove any sewage generated until this is repaired.
>
> Staff has had plans prepared for a replacement of the sewer and mitigation of the conditions that created the failure.  The estimated cost for replacement of the sewer only is $358,000.  There is an additional cost of $121,000 related to bank stabilization up and downstream of the crossing that prevents the severe erosion that has occurred.
>
> A spreadsheet with the estimates is attached.  The estimates are based on a concept developed in early 2011 as part of the CIP planning.[67]

Plaintiff's construction of the Email is untenable because she ignores the first paragraph and construes the second paragraph in a vacuum.  The first paragraph explained that erosion caused the Pipe to become a waterfall; in other words, erosion had damaged the Pipe.  The second paragraph explained the effects of the Flood to the already damaged Pipe—it broke at the outside of MH 4268, which allowed substantial water to enter the plant.  These paragraphs thus reported two sources of damage to the Pipe, creek erosion and the Flood.

Although the Email did not expressly state the Pipe was damaged prior to the Flood, the fifth paragraph explained that the estimates to repair the erosion damage were obtained in early 2011, many months before the Flood triggered FEMA funding.  This explanation, combined with

---

[67] Doc. 93-12 at 1.

the first two paragraphs, show a lack of intent to hide the fact that the Pipe had pre-Flood damage.

Plaintiff points to McDonald's testimony that he could not recall when or who from the City had informed FEMA about pre-Flood damage to the Pipe to suggest a genuine issue of fact exists regarding whether the City had informed FEMA of the pre-existing damage to the Pipe. The Email, however, establishes that the City informed FEMA of the erosion damage prior to submitting its claim.

The Court rejects Plaintiff's argument that providing estimates to repair the Pipe and stabilize the river bank was effectively engaging in a false communication to influence FEMA's decision to pay. Plaintiff conveniently ignores that the City did not submit a claim for these repairs. Additionally, Plaintiff offers no evidence that the Pipe repair estimates contained any false information. Nor does she provide evidence suggesting that the Pipe repair estimates were material to payment for damages from floodwater inflow.[68] The Court fails to see how the Pipe repair estimates would influence FEMA's decision to reimburse the City for the costs of removing debris in the bar screen building, removing excessive grit in the clarification chamber building, and unclogging approximately 20 sewer lines.[69] These facts make this argument a non sequitur. The Court concludes no reasonable jury could find falsity, materiality, or the requisite scienter with respect to the Email and its attachment.

---

[68] *Conner*, 543 F.3d at 1219 ("the false statement must be material to the government's decision to pay out moneys to the claimant"); *U.S. ex rel. Smith v. Boeing Co.*, No. CIV.A. 05-1073-MLB, 2014 WL 5025782, at *26 (D. Kan. Oct. 8, 2014) (false claim allegations require a showing of materiality, which turns on whether a statement would have a natural tendency to influence or is capable of influencing the agency's payment decision), *aff'd sub nom. United States v. The Boeing Co.*, 825 F.3d 1138 (10th Cir. 2016).

[69] Doc. 95-15 at 2.

####   b)   The Project Worksheet

On December 13, 2011, the City submitted a claim to FEMA in Project Worksheet #90 ("PW90"), requesting $22,966.73 for damages due to flood water entering the WTP.[70]  Plaintiff claims PW90 constitutes a false claim in two ways: 1) it sought reimbursement for damages caused, at least in part, by a known pre-existing condition; and 2) it concealed the failure to undertake proper mitigation measures in anticipation of the Flood.[71]  The Court finds these arguments unpersuasive.

First, Plaintiff offers no evidence to suggest that FEMA requires the Flood be the sole cause for the damage.  As discussed above, the Email establishes that the City informed FEMA of the pre-Flood damage to the Pipe.  FEMA representative Tom Montgomery even suggested that the broken sewer line near the treatment be included in the PW.[72]  The uncontroverted evidence is that floodwater entered the WTP from numerous sources, not just the broken Pipe.  Plaintiff adduces no evidence that FEMA was unaware of this fact.  Nor is there evidence that FEMA required the City to analyze and determine the sources of water that damaged the Plant.  These facts suggest that FEMA did not consider it material that floodwaters had entered the Plant from a pipe that had pre-Flood damage.

Second, the Court fails to see how PW90 concealed the City's failure to undertake proper mitigation measures in anticipation of the Flood.  The worksheet does not ask for information regarding mitigation efforts.  There is also no evidence that FEMA requested this information

---

[70] Doc. 93-10 at 5.

[71] Doc. 95 at 31.

[72] Doc. 93-11 at 1 ("Jim and I have discussed the broken sewer line near the treatment plan and have decided to include it in the PW.").

from the City.  These facts suggest that FEMA did not consider it material that floodwaters had

entered the Plant from a pipe that had pre-Flood damage.

Third, it is undisputed that the broken Pipe caused no damage to the Bar Screen Building,

the Clarification Building, and the sewer lines that required unclogging before the Flood.  This

fact suggests that the temporary measure of sandbags had done its job until it had to face the

Flood's overwhelming force.  Additionally, there is no evidence that FEMA asked the City to

analyze the extent of damage to the WTP had the Pipe been capped with concrete prior to the

Flood.  These facts suggest that FEMA did not consider the efforts to repair the broken Pipe prior

to the Flood material to its decision to pay PW90.

Fourth, Plaintiff cites 44 C.F.R. § 206.48 for the proposition that FEMA considers the

City's mitigation measures material in deciding whether to approve payment of PW90.  But that

regulation sets forth the factors to consider when evaluating a Governor's request for a major

disaster declaration.  It does not set out FEMA's standards for approving claims for disaster

relief.  Plaintiff's reliance upon this regulation is thus misplaced.

In sum, the summary judgment evidence, even when viewed in the light most favorable

to Plaintiff, fails to demonstrate that the City submitted a false claim to FEMA.  Accordingly, the

Court grants summary judgment to the City on the false-FEMA claim.

### 2. Implied False Certifications in Sewage Bills to the Army, the VA, and the BOP

In *Universal Health Services, Inc. v. United States ex rel. Escobar*,[73] the Supreme Court

held that "[w]hen . . . a defendant makes representations in submitting a claim but omits its

violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for

---

[73] 136 S. Ct. 1989 (2016).

liability if they render the defendant's representations misleading with respect to the goods or services provided."[74]  The Supreme Court made clear that courts should continue to police expansive implied certification theories "through strict enforcement of the Act's materiality and scienter requirements."[75]  In particular, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act."[76]

Plaintiff claims the City's monthly sewage bill to the Army, the VA, and the BOP impliedly certified that it had complied with all environmental laws as required by its contracts with these agencies.  According to Plaintiff, "the City has committed scores of environmental violations during the [applicable] period" contrary to these certifications.[77]  Primarily, Plaintiff claims that in violation of the Clean Water Act, its permits, and/or the Resource Conservation and Recovery Act ("RCRA"), the City discharged raw sewage into Five Mile Creek and improperly dumped septage on the ground near the WTP.[78]  Plaintiff urges the Court to grant summary judgment with respect to the occurrence of these violations, but leave the determination as to the extent of these violations for trial.

The City argues the monthly sewer bills do not support an implied false certification claim because: 1) none of the underlying service contracts state compliance with the CWA or any other environmental law was a prerequisite to payment; and 2) the bills do not contain any

---

[74] *Id.* at 1999.

[75] *Id.* at 2002 (quoting *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1270 (C.A.D.C. 2010)).

[76] *Id.*

[77] Doc. 95 at 18.

[78] *Id.*

misleading half-truths.[79]  The City argues it is entitled to summary judgment on these claims

because Plaintiff cannot establish that the implied certifications were material for payment or

that the City submitted these bills with the requisite scienter.  The Court agrees.

In *Escobar*, the Supreme Court clarified how the materiality requirement should be

enforced:

> The materiality standard is demanding.  The False Claims Act is
> not "an all-purpose antifraud statute," *Allison Engine*, 553 U.S., at
> 672, 128 S. Ct. 2123[,] or a vehicle for punishing garden-variety
> breaches of contract or regulatory violations.  A misrepresentation
> cannot be deemed material merely because the Government
> designates compliance with a particular statutory, regulatory, or
> contractual requirement as a condition of payment.  Nor is it
> sufficient for a finding of materiality that the Government would
> have the option to decline to pay if it knew of the defendant's
> noncompliance.  Materiality, in addition, cannot be found where
> noncompliance is minor or insubstantial.  [Citations omitted]
>
> In sum, when evaluating materiality under the False Claims Act,
> the Government's decision to expressly identify a provision as a
> condition of payment is relevant, but not automatically dispositive.
> Likewise, proof of materiality can include, but is not necessarily
> limited to, evidence that the defendant knows that the Government
> consistently refuses to pay claims in the mine run of cases based on
> noncompliance with the particular statutory, regulatory, or
> contractual requirement.  Conversely, if the Government pays a
> particular claim in full despite its actual knowledge that certain
> requirements were violated, that is very strong evidence that those
> requirements are not material.  Or, if the Government regularly
> pays a particular type of claim in full despite actual knowledge that
> certain requirements were violated, and has signaled no change in
> position, that is strong evidence that the requirements are not
> material.[80]

Applying the above rules, the Court concludes Plaintiff has failed to present evidence that

would lead a reasonable trier of fact to find the implied certifications were material for payment.

---

[79] Doc. 97 at 25.

[80] *Escobar*, 136 S. Ct. at 2003–04.

26

Here, although the underlying contracts had provisions that stated "the [City] shall operate [the WTP] in conformity with applicable law, rules, and regulations," there is no evidence that these government agencies considered regulatory compliance a condition of payment.  And while that is not dispositive of materiality, it is relevant and supports the City's contention that the implied certifications were not material for payment.  There is no evidence that these agencies would refuse to pay their sewer bills had they been aware of the environmental violations.  And Plaintiff adduces no evidence of the City's knowledge as to whether these agencies would refuse to pay their monthly sewer bills based on regulatory noncompliance.

The sewer bills in this case did nothing more than demand payment for the federal agency's percentage of plant flow and the contracted percentage rates for annual operating and maintenance expenses.  Plaintiff presents no evidence to suggest that the City did not treat the wastewater as represented in the monthly bills.  In contrast, the *Escobar* defendant submitted claims for payment using payment codes that corresponded to specific services it represented that it had provided, such as individual therapy, family therapy, preventive medication counseling, and other types of treatment.[81]  Additionally, those claims used National Provider Identification numbers corresponding to specific job titles, which led everyone to conclude that the clinic had complied with basic staff and licensing requirements for mental health facilities.  Thus, contrary to Plaintiff's assertion, her implied false certification claim does not neatly fit within *Escobar's* framework.

Plaintiff's reliance upon the Tenth Circuit's *Lemmon*[82] case is also misplaced.  In *Lemmon*, the government hired the defendant to properly dispose of hazardous waste material.

---

[81] *Id*. at 2000.

[82] *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163 (10th Cir. 2010).

The contract obligated the defendant to periodically submit written reports detailing its receipt and disposal of water, submit follow-up reports detailing any problems encountered, maintain records sufficient to allow the government to confirm compliance with the contractual provisions, report all contractual violations to the government, and provide and maintain an inspection system for government review.[83]  In contrast, the contracts here are for wastewater service and do not have similar detailed requirements.  There is no evidence that the City did not provide the contracted service—treatment of these agencies' sewage.  And it is uncontroverted that the Army, VA, and BOP never requested or audited the WTP to ensure environmental compliance, which suggests that regulatory compliance was not material to payment.

In sum, the summary judgment evidence, even when viewed in the light most favorable to Plaintiff, fails to demonstrate that the implied certifications in the monthly water bills were material for payment or that the City submitted these bills with the requisite scienter. Accordingly, the Court grants summary judgment to the City on the implied false certification claim.  Conversely, the Court denies Plaintiff's partial summary judgment on this claim because she has not presented evidence entitling her to summary judgment.

### B.    FCA Retaliation Claim (Count II)

Count II asserts the City "harassed, demoted, constructively discharged, caused severe emotional distress and otherwise discriminated against [Plaintiff], in whole or in part because of her lawful acts taken involving potential violations of the False Claims Act by Defendant."[84] The FCA prohibits employers from retaliating against an employee for "lawful acts. . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the

---

[83] *Id.* at 1166.

[84] Doc. 24 at 36, ¶ 224.

FCA]."[85]  The City argues it is entitled to summary judgment on this claim because Plaintiff cannot establish a prima facie case of retaliation; and even if she could, she cannot show that the City's proffered, non-retaliatory reasons for demoting her were pretexts.

The parties agree the *McDonnell Douglas*[86] burden-shifting framework applies to FCA-retaliation claims.[87]  Under *McDonnell Douglas*, Plaintiff initially bears the burden of production to establish a prima facie case of retaliation.[88]  If Plaintiff establishes a prima facie case, the burden shifts to the City to articulate a facially nonretaliatory reason for its actions.[89]  If the City articulates a legitimate nonretaliatory reason, the burden shifts back to Plaintiff to present evidence from which a jury might conclude that the City's proffered reason is pretextual, that is, "unworthy of belief."[90]

### 1. Prima facie case of retaliation

To establish a prima facie case of FCA retaliation, a plaintiff must prove: 1) the employee engaged in protected activity; 2) the employer knew about the activity; and 3) the employer took adverse employment action against the employee for engaging in the protected activity.[91]  The City does not dispute that Plaintiff engaged in protected conduct, but it challenges the establishment of the last two elements.

---

[85] 31 U.S.C. § 3730(h).

[86] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[87] Doc. 93 at 45; Doc. 98 at 54.

[88] *McDonnell Douglas*, 411 U.S. at 802.

[89] *Id.*

[90] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (citing *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[91] *U.S. ex rel. Feaster v. Dopps Chiropractic Clinic, L.L.C.*, No. 13-1453-EFM, 2015 WL 6801829, at *7 (D. Kan. Nov. 5, 2015); *Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 752 (E.D. Va. 2017) (listing three elements for FCA retaliation claim: (1) employee engaged in protected activity, (2) the employer knew about the activity, and (3) the employer took adverse action against him as a result.).

Although the City acknowledges Plaintiff engaged in protected activity when she told City Manager Miller about the false claim to FEMA, the parties' arguments regarding notice requires the Court to determine whether her other reported concerns constituted protected activity.  The City contends that Plaintiff cannot demonstrate that Superintendent Klingler, Public Works Director McDonald, and HR Director Lanter, the City employees who allegedly retaliated against Plaintiff, knew she had questioned the claims submitted to FEMA.  The City argues only the City Manager knew of this protected activity and he made no adverse employment decisions against her.  Plaintiff says the City's arguments contain two flaws: 1) her reports about ongoing maintenance problems and improper dumping at the plant to McDonald and Klingler also constituted protected activity, and 2) even if her protected activity is limited to the FEMA claim, there is evidence that Miller told McDonald about that activity.  Alternatively, she argues that Miller's knowledge should be imputed to McDonald and Klingler under the reverse cat's paw theory.

a)      Notice/Knowledge

In *McBride v. Peak Wellness Center, Inc.*,[92] the Tenth Circuit discussed the notice requirement for a FCA retaliation claim:

> [A] plaintiff claiming retaliatory discharge under the FCA "has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a private qui tam action or assisting in an FCA action brought by the government."  [*United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996)].  Notice may be provided in a number of ways: for example, by informing the employer of "illegal activities" that would constitute fraud on the United States, *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439 (6th Cir. 2008); by warning the employer of regulatory noncompliance and false

---

[92] 688 F.3d 698 (10th Cir. 2012).

> reporting of information to a government agency, *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927 (8th Cir. 2002); or by explicitly informing the employer of an FCA violation, *Eberhardt v. Integrated Design & Constr. Inc.*, 167 F.3d 861, 867 (4th Cir. 1999).  But merely informing the employer of regulatory violations, without more, does not provide sufficient notice, because doing so gives the employer "no suggestion that [the plaintiff is] going to report such noncompliance to government officials" or bring "her own qui tam action." *Ramseyer*, 90 F.3d at 1523.  Whistleblowers "must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Id.* at 1523 n. 7.[93]

Plaintiff's argument that her reports of maintenance issues, improper dumping, and regulatory noncompliance constitute protected activity has several problems.  First, she cites no evidence to establish that she complained about the improper dumping to any City official.  And although she may have discussed the trickling filter problems, the broken holding tank mixers, and the broken H2S monitors with Miller, McDonald, and/or Klingler, she did not tell them that these maintenance problems put the City in breach of its federal contracts, that she was going to report these problems to government officials, or that she intended to bring her own qui tam action.  Second, plant maintenance and regulatory compliance are a part of her job as Assistant Superintendent, thus her concerns about them would not indicate to them that she was planning to report illegal activities or initiate a qui tam action.  Under these circumstances, the Court finds that Plaintiff's reports of ongoing maintenance problems and regulatory noncompliance did not provide the City with sufficient notice that she was making them to stop the City from presenting false claims to these federal agencies.  Simply put, there is no evidence other than that Plaintiff was doing her job by raising and attempting to fix these maintenance issues.

---

[93] *Id.* at 704.

As to whether Miller's knowledge about Plaintiff's FEMA activity may be imputed to McDonald, Klingler, and Lanter under a reverse cat's paw theory, the Court finds this argument superfluous.  The cat's paw theory refers to a situation in which "a biased subordinate, who lacks decision-making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."[94]  Plaintiff argues the reverse applies here, that Miller had the discriminatory animus and infected McDonald, Klinger, and Lanter by outright telling them or hinting to them that Plaintiff was creating trouble and should be stopped.[95]  As both parties noted, the Tenth Circuit recognizes the "cat's paw" doctrine, but has not yet addressed a reverse cat's paw situation.[96]  Likewise, this Court finds it unnecessary to address this doctrine because this issue requires the same factual determination—whether Miller told the adverse employment decisionmakers about the protected activity to get rid of Plaintiff.

Plaintiff offers the temporal proximity between her meeting with Miller and the abrupt change in Klingler's demeanor and treatment of her as evidence that Miller told McDonald and/or Klingler about her FEMA activity.  Plaintiff also testified that McDonald knew things she had disclosed only to Miller.  The Court finds a fact issue exists regarding whether Miller relayed Plaintiff's FEMA fraud concerns to McDonald or Klingler, making summary judgment based on lack of notice of protected activity inappropriate.

---

[94] *EEOC v. BCI Coca–Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006), *cert. dism'd*, 549 U.S. 1334 (2007).

[95] Doc. 98 at 59.

[96] *Muhammad v. Hall*, 674 F. App'x 810, 813 (10th Cir. 2017) ("This court has not yet addressed whether the subordinate can be liable in a 'reverse cat's paw' situation.").  *But see Ware v. Denver Health*, No. 09-CV-01103REBBNB, 2010 WL 2740078, at *4 (D. Colo. July 12, 2010) (stating the cat's paw doctrine does not operate in the reverse).

**b)    Adverse Employment Actions for Engaging in Protected Activity**

To constitute an adverse employment action, "the employer's conduct must be 'materially adverse' to the employee's job status."[97]  "Each case must be 'judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances,' and the inquiry does not 'turn on a plaintiff's personal feelings' about the circumstances of the case."[98]

In *Johnson v. Weld County, Colorado*,[99] the Tenth Circuit explained how to approach the question of whether an employer's actions were materially adverse:

> [W]e are obligated to bear in mind that "Title VII protects individuals 'not from all retaliation' but only from retaliation 'that produces an injury or harm'" that itself rises to a "'level of seriousness.'"  *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 [(10th Cir. 2007)] (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).  To qualify under this standard, we held in *Williams* that a plaintiff must show "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* (quoting *White*, 548 U.S. at 68) (internal quotation marks omitted). "Requiring this level of adversity . . . is necessary 'to separate significant from trivial harms.'" *id.* (quoting *White*, 548 U.S. at 68), "petty slights, minor annoyances, and simple lack of good manners," *White*, 548 U.S. at 68.  "Otherwise, minor or even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit."  *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).[100]

---

[97] *Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003).

[98] *Daniels v. United Parcel Serv., Inc.*, 797 F. Supp. 2d 1163, 1187 (D. Kan. 2011), *aff'd*, 701 F.3d 620 (10th Cir. 2012) (internal citations omitted).

[99] 594 F.3d 1202 (10th Cir. 2010).

[100] *Id.* at 1216 (parallel citations omitted).  *See Difiore v. CSL Behring, U.S., LLC*, 171 F. Supp. 3d 383, 393 n.4 (E.D. Pa. 2016) (noting courts have applied Title VII anti-retaliation requirements in FCA retaliation cases,

Plaintiff argues that she suffered the following adverse employment actions in retaliation for complaining to Miller on March 26, 2013: (i) Klingler began overly scrutinizing her work; (ii) Klingler dramatically increased her workload, gave her long lists of busy-work type tasks to complete, and then ignored her;[101] (iii) Klingler, McDonald, and Lanter denied her request for an extension to obtain her Class IV certification;[102] (iv) the City demoted her for failing to obtain her Class IV certification within 12 months of her promotion to Assistant Superintendent; and (v) the City constructively discharged her.[103]  The City argues these acts do not constitute adverse employment actions.

### (i)     The Memo

Plaintiff presents the Memo as evidence that Klingler began overly scrutinizing her work. It is undisputed that this memo was issued after Klingler's management style had been criticized when WTP operator Bennetts quit at the end of March 2013 and after McDonald counseled Klingler to communicate his expectations to his subordinates.  The memo itself contains no opprobrious or reproachful language.  At one point, Klingler even complimented Plaintiff, writing, "You have done a good job of taking care of this during normal operations and have responded in a timely manner to calls regarding plant operations on the weekend."[104]  The remainder of the Memo requested documentation for sick leave and a timeline regarding a customer complaint.  Additionally, the Memo was not placed in Plaintiff's personnel file as a

---

including what constitutes an "adverse employment action"), *aff'd sub nom. DiFiore v. CSL Behring, LLC*, 879 F.3d 71 (3d Cir. 2018).

[101] Doc. 98 at 57.

[102] *Id.* at 28, 61.

[103] Doc. 98-8 at 2.

[104] Doc. 93-18 at 2.

disciplinary event.[105]  Simply put, there is no objective evidence in the record that the Memo would deter a reasonable employee from reporting the FEMA fraud.  The Court finds that the Memo does not constitute an adverse employment action.[106]

### (ii)    Increase in Workload and Failure to Assist

Plaintiff next claims she suffered an adverse employment action when Klingler ordered her to contact him via email only, increased her workload dramatically with menial tasks, made himself unavailable to assist her, and shifted his responsibilities to her.  She argues that the abrupt change in her working conditions and in the way that Klingler treated her, almost immediately on the heels of her protected activities, is sufficient evidence from which a jury could reasonably conclude that his harassment was motivated at least in part by her protected activity.  She also claims that Klingler purposely overloaded her with work to prevent her from studying for and passing her Class IV exam, which resulted in her demotion and constructive discharge.  She argues that this was Klingler's scheme to prevent her from studying for and passing her Class IV exam.

The City argues that although Plaintiff had been appointed as Assistant Superintendent on August 16, 2012, due to her duties as the project representative of the UV building, she did not begin acting as full-time Assistant Superintendent until the end of 2012.[107]  Thus, Plaintiff had been performing the assistant superintendent job full-time for less than four months when she

---

[105] Doc. 98 at 24, ¶ 110.

[106] *See Smith v. Aaron's Inc.*, 325 F. Supp. 2d 716, 727 (E.D. La. 2004) (holding that a supervisor giving "direct goals to accomplish and work-related instructions" was not harassment despite plaintiff's subjective feelings); *Aikens v. Banana Republic, Inc.*, 877 F. Supp. 1031, 1039 (S.D. Tex. 1995) ("[T]he mere fact that [plaintiff] experienced 'pressure' or was 'nitpicked' does not establish such intolerable working conditions as to give rise to a constructive discharge.").

[107] Doc. 98 at 21, ¶ 94.

began receiving assignments from Klingler.[108]  The City further argues that because it is

uncontroverted that the tasks Klingler assigned to her fell within the scope of her job duties,[109]

Klingler's actions do not constitute harassment severe enough to constitute prima facie adverse

employment action.

"Job duty assignments are neither automatically actionable nor categorically non-

actionable."[110]  Courts are reluctant to hold that changes in job duties amount to adverse

employment action when unaccompanied by any tangible harm such as a reduction in salary.[111]

Plaintiff, however, alleges a tangible harm—less time to study for her Class IV exam, which

resulted in her demotion.  She presents affidavits from two former WTP employees to support

her claim that Klingler's campaign of harassment was his modus operandi to get rid of unwanted

personnel.  Keith Smith stated, in pertinent part:

> 1.  During my tenure at Leavenworth, I observed that when Charlie
> Klingler liked an employee, he made sure they had time to study
> for their operator's exams.
>
> 2.  However, if [he] did not like a particular employee, he would
> overload them with work so that they could not study for their
> tests, would fail, and would therefore be terminated.[112]

Tom Schellhorn declared, in pertinent part:

---

[108] *Id.*

[109] Doc. 98 at 26, ¶ 117.

[110] *Daniels v. United Parcel Serv., Inc.*, 797 F. Supp. 2d 1163, 1188 (D. Kan. 2011) (citing *Semsroth v. City of Wichita*, 555 F.3d 1182, 1185–86 (10th Cir. 2009)), *aff'd*, 701 F.3d 620 (10th Cir. 2012).

[111] *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (stating the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment); *see also Melton v. Nat'l Dairy LLC*, 705 F. Supp. 2d 1303, 1329 (M.D. Ala. 2010) ("Changes in work assignments that do not cause any economic injury to the employee do not constitute adverse employment action.").

[112] Doc. 98-4 at 2, Dec. of Keith Smith, ¶¶2–3.

> 5.  It was easy to see that [Plaintiff's] workload was significantly larger than [her predecessor] when he had her job.  She was always at the plant, often working very late into the evening.
>
> 6.  Mr. Lough [Plaintiff's predecessor] never worked those hours.
>
> 7.  It does not take a genius to conclude that Charlie Klingler did not like it when Michele attempted to get things fixed around the plant and attempted to address various safety concerns around the plant and he hammered her with work because of that.[113]

The above evidence, when viewed in the light most favorable to Plaintiff, is sufficient to demonstrate that a reasonable person might have viewed her workload as intolerable.  The Court finds a genuine dispute of material fact exists as to whether the amount of her workload was designed to dissuade her from engaging in the protected activity and thus constitutes an adverse employment action.[114]

### (iii)   Denial of Extension for Class IV Certification

Klingler, McDonald, and Lanter all denied Plaintiff's request for a six-month extension to obtain her Class IV certification.  The City states that it has not granted an extension of a deadline to pass the Class IV operator exam, other than for a few days to meet a testing schedule.  This is exactly what the City did when it extended Plaintiff's deadline from August 16, 2013 to August 29, 2013.[115]  Plaintiff attempts to controvert this fact by pointing to her testimony that two other operators would have been given an extension of time in which to pass their exams if

---

[113] Doc. 98-6 at 2, Decl. of Tom Schellhorn, ¶¶ 5-7.

[114] *Cf. Young v. White*, 200 F. Supp. 2d 1259, 1272–73 (D. Kan. 2002) (holding no adverse employment action when a supervisor assigns tasks within his authority even though plaintiff "might disagree with the tasks that are assigned or with the decision to give certain tasks to certain individuals" because such assignment did not "alter[ ] plaintiff's employment status in any way or had any negative effect on plaintiff's standing within the organization."); *Roecker v. Brennan*, No. 15-7201-DDC-JPO, 2017 WL 445504, at *11 (D. Kan. Feb. 2, 2017) (concluding plaintiff's retaliation claim fails because she has not established a causal or temporal link between plaintiff's work assignment and the protected activity of filing an EEO complaint sufficient for her retaliation claim to survive summary judgment).

[115] Doc. 93-19 at 5.

they had not already taken the tests three times in one year.[116]   Plaintiff, however, offers no evidence regarding these two other operators.  Thus, there is no evidence to infer these operators were similarly situated assistant superintendents.  Moreover, her testimony ultimately was that no extensions were granted.

Plaintiff further that her situation was different because another testing date was offered within the one-year window.  But Plaintiff offers no details or evidentiary support.  It is uncontroverted that Plaintiff's deadline to obtain Class IV certification was August 16, 2013, one year from the date of her promotion to Assistant Superintendent.  Plaintiff took and failed the Class IV exam in December 2012, on May 9, 2013, August 2, 2013, and August 29, 2013.[117] The City allowed Plaintiff to take the August 29, 2013 exam, which was outside the one-year window.  Plaintiff has thus failed to establish that the denial of her six-month extension for Class IV certification was causally connected to her protected activity.

### (iv)   Demotion

It is uncontroverted that Plaintiff's demotion constitutes an adverse employment action.[118]   The City argues, however, that Plaintiff has failed to show her demotion was causally linked to the protected activity.[119]   Even though Plaintiff's demotion occurred more than five months after her protected activity, she nonetheless may establish an inference of retaliatory motive by proving a pattern of retaliatory conduct began soon after she engaged in the activity,

---

[116] Doc. 98 at 29, ¶ 128 (citing Dep. of Coffman, 251:1-23).

[117] Doc. 98 at 27, ¶¶ 119, 121, and 131.

[118] Doc. 99 at 26.

[119] *Id*. at 28.  *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (stating temporal proximity between opposition and adverse action must be "very close" to warrant a conclusion of causality); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (holding lapse of three months insufficient to establish a causal connection).

which culminated in her demotion.[120]  Because her workload and demotion are inextricably

intertwined, the Court finds a factual issue exists as to whether the amount of her workload was

designed to prevent her from obtaining Class IV and result in her demotion.  Under these

circumstances, the Court cannot say on summary judgment whether Plaintiff's demotion

constituted an adverse employment action.

### (v)   Constructive Discharge

A constructive discharge occurs when an employer, by discriminatory or retaliatory

actions, makes or allows the employee's working conditions to become so intolerable that the

employee has no other choice but to quit.[121]  A finding of constructive discharge depends upon

whether a reasonable man would view the working conditions as intolerable, not upon the view

of the employee-plaintiff.[122]  The conditions of employment must be objectively intolerable;

plaintiff's subjective views of the situation are irrelevant.[123]  "If an employee resigns of her own

free will, even as a result of the employer's actions, that employee will not be held to have been

constructively discharged."[124]  "The bar is quite high in such cases: a plaintiff must show [s]he

had no other choice but to quit."[125]

---

[120] *Marx v. Schnuck Mkts. Inc.*, 76 F.3d 324, 329 (10th Cir.1996) (recognizing that protected conduct closely followed by adverse action may justify an inference of retaliatory motive and holding that the close temporal proximity requirement should not be read too restrictively where a pattern of discrimination begins soon after protected activity and only culminates later in actual discharge).

[121] *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986); *Irving v. Dubuque Packing Co.*, 689 F.2d 170, 172 (10th Cir. 1982).

[122] *Derr*, 796 F.2d at 344.

[123] *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998); *Yearous v. Niobrara Cty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997).

[124] *Jeffries v. State of Kan.*, 147 F.3d 1220, 1233 (10th Cir. 1998).

[125] *Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).

Plaintiff contends she was forced to quit because the campaign of harassment caused her extreme stress, anxiety, and depression.[126]  But Plaintiff's claim is conclusory.  Moreover, an employee cannot survive summary judgment merely by producing evidence that work conditions were difficult or unpleasant.[127]  Viewing the evidence in a light most favorable to Plaintiff, she has not raised a genuine issue of material fact whether she had no choice but to quit.  Accordingly, she cannot rely on constructive discharge as a materially adverse action for her retaliation claim.[128]

In sum, the Court finds that under the circumstances, the Nitpicky Memo and the constructive discharge do not constitute materially adverse actions.  Plaintiff has failed to adduce evidence of causality for the denial of the certification extension, thus that decision does not constitute a materially adverse action.  A fact issue, however, exists regarding whether Klingler's work assignments to Plaintiff were designed to prevent her from studying for and passing her Class IV certification exam, which led to her demotion.  The Court concludes Plaintiff has established a prima facie case of retaliation.

### 2.  Pretext

Proceeding to the next *McDonnell Douglas* step, the Court finds that the City has articulated a facially, nonretaliatory reason for demoting Plaintiff—she failed to pass the Class IV certification exam within twelve months of her promotion to Assistant Superintendent.  The City argues that Plaintiff cannot show that its proffered, nonretaliatory reason for demoting her was pretext.  Plaintiff argues pretext based on the following: 1) a former employer observed that

---

[126] Doc. 98-8 at 2, Plaintiff's Resignation Letter.

[127] *Fischer v. Forestwood Co.*, 525 F.3d 972, 981 (10th Cir. 2008).

[128] *VonLintel v. Eagle Commc'ns, Inc.*, No. CV 14-4125-KHV, 2016 WL 7179465, at *13 (D. Kan. Dec. 9, 2016).

Klingler had used the tactic of overworking employees to keep them from studying in the past to get rid of a problem employee,[129] and 2) the City has not provided any explanation for why Klingler began harassing her, when he had previously "adored" her.

A plaintiff shows "pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[130]  A plaintiff typically makes a showing of pretext in one of three ways: "(1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) with evidence that .... he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness."[131]

"In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision, not as they appear to the plaintiff."[132] Moreover, the Court does not ask "whether the employer's proffered reasons were wise, fair or correct," but only "whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."[133]

The Court rejects Plaintiff's argument that the City's failure to provide a reason for Klingler's sudden change in attitude is evidence of pretext.  Plaintiff cites no authority for this

---

[129] Doc. 98 at 61.

[130] *Green v. New Mexico*, 420 F.3d 1189, 1192–93 (10th Cir. 2005) (internal quotations omitted).

[131] *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

[132] *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (internal quotation marks omitted) (quoting *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (emphasis in original)).

[133] *Debord*, 737 F.3d at 655.

proposition.  Additionally, the City did provide an explanation for Klingler's change in attitude—Bennett's resignation raised concerns about Klingler's management style, which resulted in McDonald counseling Klingler to communicate his expectations clearly and let his employees do their jobs.[134]

The Court nonetheless finds a genuine dispute exists regarding whether the City's proffered reason for demoting Plaintiff was pretextual.  The City argues that Plaintiff's theory that Klingler overwhelmed her with work to prevent her from studying for and passing her Class IV certification overlooks the following facts: 1) she had over eight months before the alleged retaliation began to obtain Class IV certification; 2) the tasks Klingler assigned to her were part of her job; and 3) the temporal proximity between her protected conduct and the work assignment alone is insufficient to demonstrate pretext.[135]  The Court finds the first argument unpersuasive.  The City gave Plaintiff twelve months to obtain certification, not eight months.  Plaintiff also provided a reasonable explanation for not taking the exam more than once during the first eight months.  She explained that during her first five months as Assistant Superintendent, she was also in charge of the UV building project so had planned to prepare for the exam after that project ended and she became more comfortable in her management position.[136]

The City's second argument echoes its argument that Klingler's work assignments were not adverse employment actions under the circumstances.  For the same reasons stated in Section III.B.1.b)(ii) above, the Court finds that the affidavits from two former employees and Plaintiff's

---

[134] Doc. 99 at 28.

[135] *Id*.

[136] Doc. 98-12 at 2.

testimony raise a factual issue as to whether her work assignments were intended to provide the City with a pretext to demote her.

Finally, although temporal proximately alone is insufficient to demonstrate pretext, Plaintiff has provided other evidence to demonstrate pretext.  Specifically, she presents the affidavits from two former employees, as well as her own testimony.  The sudden change in Klingler's attitude almost at the exact time when Plaintiff reported her FEMA concerns to Miller, combined with the other evidence, could be viewed by the jury as evidence of pretext or of animus against Plaintiff for engaging in protected activity.  Summary judgment is thus inappropriate on the FCA retaliation claim.

### C. Common Law Whistleblower Retaliation and Retaliatory Discharge Claims (Counts III and IV, respectively)

Under the "adequate alternative remedies" doctrine, bringing a statutory claim precludes a plaintiff from bringing a common law claim that seeks to redress the same harm as the statutory claim if the statutory remedy is adequate.[137]  Courts have held that an FCA claim is not an adequate alternative remedy when the common law claim "clearly encompasses conduct beyond violations of the FCA" or addresses "different harms" than the FCA claim.[138]

The City argues the FCA precludes Counts III and IV as they are duplicative of Counts I and II.  Alternatively, the City argues these claims fail for the same reasons as the FCA claims. The City contends that in the Pretrial Order, Plaintiff made clear that her state law retaliation claims relate to reporting "misuse or fraud in the procurement or expenditure of government

---

[137] *Lipka v. Adv. Health Grp., Inc.*, No. 13-CV-2223, 2013 WL 5304013, at *7 (D. Kan. Sept. 20, 2013) (citing *Campbell v. Husky Hogs, LLC*, 255 P.3d 1 (Kan. 2011)).

[138] *Id.* (citations omitted).

funds," and/or her reports "regarding fraud against government budgets."[139]  Because her FCA claims are premised on these same reports, the City argues the adequate alternative remedy doctrine precludes her common law claims.

Plaintiff responds that she has alleged retaliation and whistleblowing based not only on fraud against the federal government, but also on safety issues at the plant.[140]  She contends that because it is unclear whether the fact-finder would find retaliation based on reports of fraud, maintenance, and improper dumping or reporting unsafe working conditions, or both, the False Claims Act does not provide an adequate alternative remedy, and summary judgment is inappropriate.

The Court agrees with the City that Plaintiff's common law retaliatory discharge claim encompasses the same conduct and harms as her FCA retaliation claim.  The Pretrial Order states that an essential element of Plaintiff's common law retaliation claim is that she "made good faith reports either internally or to a governmental agency regarding fraud against government budgets."[141]  Plaintiff's reports of fraud were also at the heart of her FCA retaliation claim.  The Pretrial Order does not reflect that her common law retaliation claim is based on reports of illegal conduct outside the scope of the FCA.[142]  Thus, because Plaintiff's common law retaliation claim encompasses the same harms and conduct as her FCA retaliation claim, the Court finds that her common law retaliation claim is barred by the adequate alternative remedy doctrine.

---

[139] Doc. 91 at 15–16.

[140] *See* Doc. 24 ¶ 227 ("A reasonably prudent person would have concluded that Defendant, was engaged in violation of rules, regulations or laws pertaining to public health, safety or general welfare.").

[141] Doc. 91 at 16.

[142] *See id.*

By contrast, the Pretrial Order states that an essential element of Plaintiff's Count III whistleblower retaliation claim is that "a reasonable person would have concluded that the Defendant was violating rules, regulations, or laws pertaining to public health, safety or general welfare."[143]   Another element is that Plaintiff "reported the Defendant's violations of rules, regulations or laws internally or to a governmental agency."[144]   This language tracks with Plaintiff's First Amended Complaint.[145]   Furthermore, this language demonstrates that Count III is premised on Plaintiff's reports of both fraud and safety issues at the plant, and therefore her claim relates to conduct outside the scope of her FCA retaliation claim.   Accordingly, the Court finds that the adequate alternative remedy doctrine does not preclude Plaintiff's whistleblower retaliation claim.   The City's motion for summary judgment is therefore denied as it relates to Count III and granted as it relates to Count IV.[146]

### D.   Negligent Infliction of Emotional Distress (Count V)

The City seeks summary judgment on Count V, arguing: 1) this Court lacks subject matter jurisdiction over it because Plaintiff failed to provide pre-suit notice as required by K.S.A. 12-105b; and 2) Plaintiff cannot show she has suffered a qualifying physical injury.   As to the latter, Plaintiff claims that she experienced chest pain, which constitutes a qualifying physical injury as it required visits to the emergency department and to cardiologists.   As to pre-suit

---

[143] *Id.* at 15.

[144] *Id.* at 16.

[145] Doc. 24, ¶ 227.

[146] The City also argues that the Counts III and IV claims fail for the same reasons as her FCA retaliation claim.   *See* Doc. 93 at 49 (City arguing that it is entitled to summary judgment on Counts III and IV "for the reasons stated in Section IV, incorporated herein by reference").   As explained above, however, the Court finds that material issues of fact remain as to Plaintiff's FCA retaliation claim.   *See supra* Part III.B.   The Court further finds that material issues of fact also remain as to Plaintiff's Count III whistleblower retaliation claim, and the Court is not persuaded that the City's arguments as to her FCA retaliation claim provide a basis for granting their summary judgment motion as to Count III.

notice, Plaintiff claims that she substantially complied with K.S.A. 12-105b under the unique

circumstances of this case.  She contends that because the FCA required her to file her claims

under seal, she was unable to comply with K.S.A. 12-105b without violating the FCA's seal

requirement.  Alternatively, she contends that the City received notice of the First Amended

Complaint when this Court unsealed the initial complaint and when the media reported the story.

As a result, she argues that the City was aware of her claims and was not prejudiced in not

receiving formal notice.  Finally, she suggests that the City's failure to attempt to settle these

claims constitutes denial of her claims, "which would have then permitted Plaintiff to file her

claim."[147]  The Court finds Plaintiff's arguments unpersuasive.

> K.S.A. 12-105b(d) provides:

> > Any person having a claim against a municipality or against an
> > employee of a municipality which could give rise to an action
> > brought under the Kansas tort claims act shall file a written notice
> > as provided in this subsection before commencing such action.
> > The notice shall be filed with the clerk or governing body of the
> > municipality and shall contain the following: (1) The name and
> > address of the claimant and the name and address of the claimant's
> > attorney, if any; (2) a concise statement of the factual basis of the
> > claim, including the date, time, place and circumstances of the act,
> > omission or event complained of; (3) the name and address of any
> > public officer or employee involved, if known; (4) a concise
> > statement of the nature and the extent of the injury claimed to have
> > been suffered; and (5) a statement of the amount of monetary
> > damages that is being requested.  In the filing of a notice of claim,
> > substantial compliance with the provisions and requirements of this
> > subsection shall constitute valid filing of a claim.  The contents of
> > such notice shall not be admissible in any subsequent action arising
> > out of the claim.  Once notice of the claim is filed, no action shall
> > be commenced until after the claimant has received notice from the
> > municipality that it has denied the claim or until after 120 days has
> > passed following the filing of the notice of claim, whichever
> > occurs first.  A claim is deemed denied if the municipality fails to
> > approve the claim in its entirety within 120 days unless the

---

[147] Doc. 98 at 64.

> interested parties have reached a settlement before the expiration of that period.  No person may initiate an action against a municipality or against an employee of a municipality unless the claim has been denied in whole or part.  Any action brought pursuant to the Kansas tort claims act shall be commenced within the time period provided for in the code of civil procedure or it shall be forever barred, except that, a claimant shall have no less than 90 days from the date the claim is denied or deemed denied in which to commence an action.

"The notice requirements in K.S.A. § 12–105b(d) are mandatory and a condition precedent to bringing a tort claim against a municipality."[148]

The Court rejects Plaintiff's argument that she was unable to comply with K.S.A. 12-105b's notice requirement without violating the FCA's seal requirement.  Although providing 105b-notice may alert the defendant of a pending criminal investigation and undermine the purpose of the FCA's seal requirement, these requirements do not conflict procedurally.  Plaintiff can comply with both statutes by providing pre-suit notice and then file the complaint under seal.  The Court also rejects any argument that compliance with the FCA's seal requirement excuses noncompliance with K.S.A. 12-105b.  Plaintiff has failed to provide any authority to support that proposition and the Court has found none.

Likewise, the Court rejects Plaintiff's argument that she substantially complied with the 105b-notice requirement because the City received notice of Plaintiff's claims when this Court unsealed the original complaint and when the news media publicized them.  K.S.A. 12-105b requires **prior** notice — the notice must be written and filed with the municipality prior to the commencement of litigation.  An action generally commences upon the filing of a complaint.  Allowing the original complaint to serve as the 105b-notice for the Amended Complaint renders

---

[148] *Miller v. Brungardt*, 916 F. Supp. 1096, 1098 (D. Kan. 1996).

the statute meaningless because the litigation has already commenced.  The news media coverage also fails to constitute the requisite notice under the statute because they too were post-suit.

Equally unavailing is Plaintiff's argument that the City's failure to attempt to settle her claims constitutes a denial of her claims which then allowed her to commence litigation.  This argument puts the cart before the horse.  The City cannot attempt to settle Plaintiff's claims if it was unaware of them.  Moreover, K.S.A. 12-105b contains two triggering events: 1) the filing of the 105b-notice, or 2) the claimant's receipt of a denial of the claims.  By requiring the claimant to receive notice from the municipality that it has denied the claim, the statute contemplates that the denial be affirmative or concrete so that a triggering date may be identified.  Plaintiff's argument requires assuming a denial based on inaction, which is contrary to the statute's affirmative framework.

The Court concludes Plaintiff did not provide the City with pre-suit notice pursuant to K.S.A. 12-105b.  The Court thus lacks subject matter jurisdiction over Count V.  Accordingly, the City is entitled to summary judgment as to Count V.  This conclusion renders discussion on the physical injury issue unnecessary.

## IV.   CONCLUSION

The summary judgment evidence, even when viewed in the light most favorable to Plaintiff, fails to demonstrate that the City submitted a false claim to FEMA.  Accordingly, the Court grants summary judgment to the City on the FEMA claim.  Likewise, Plaintiff fails to adduce evidence to demonstrate that the implied certifications in the monthly water bills were material for payment or that the City submitted these bills with the requisite scienter.  Accordingly, the Court grants summary judgment to the City on the implied false certification

claim.  For the same reasons, the Court denies Plaintiff's motion for summary judgment on the FCA-false claims (Count I).

Summary judgment is inappropriate on the FCA-retaliation claim (Count II) because issues of fact remain with respect to knowledge, materially adverse employment action, and pretext.  Summary judgment is also inappropriate on Plaintiff's common law Whistleblower Retaliation claim (Count III) because her FCA retaliation claim does not provide an adequate alternative remedy for this claim and genuine disputes of fact remain as to it.  However, the Court grants the City's motion for summary judgment as to Plaintiff's common law Retaliatory Discharge claim (Count IV) because her FCA claim does provide an adequate alternative remedy for this claim.  Finally, because Plaintiff did not provide the City with pre-suit notice pursuant to K.S.A. 12-105b, this Court lacks subject matter jurisdiction over Plaintiff's Negligent Infliction of Emotional Distress claim, entitling the City to summary judgment on Count V.

**IT IS THEREFORE ORDERED** that the City's motion for summary judgment (Doc. 92) is **GRANTED IN PART and DENIED IN PART.**  The Court grants summary judgment to the City on Counts I, IV, and V.

**IT IS FURTHER ORDERED** that Plaintiff's partial summary judgment (Doc. 94) is **DENIED**.

**IT IS SO ORDERED.**


Dated: <u>March 23, 2018</u>

       S/ Julie A. Robinson
      JULIE A. ROBINSON
      CHIEF UNITED STATES DISTRICT JUDGE

AO 450 (Rev. 01/09)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
## District of Kansas

THE UNITED STATES OF AMERICA ex rel.
MICHELE COFFMAN,
*Plaintiff(s)*

v.

THE CITY OF LEAVENWORTH, KANSAS
*Defendant(s)*

)
)
)
)
)
)

Civil Action No.   14-2538

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ %, per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

☑ other:    Summary judgment granted in Defendant's favor as to Counts I, IV, and V pursuant to the Memorandum
and Order filed on March 23, 2018 (Doc. 106); and Count III dismissed for lack of subject matter jurisdiction
pursuant to the Memorandum and Order filed on May 10, 2018.

This action was *(check one)*:

☐ tried by a jury with _____ presiding, and the jury has
rendered a verdict.

☐ tried by _____ without a jury and the above decision
was reached.

☑ decided by   Chief Judge Julie A. Robinson                              on a motion for
summary judgment (Doc. 92), a motion for partial summary judgment (Doc. 94), and a motion for partial judgment
on the pleadings (Doc. 107).

Date: _____ July 30, 2018 _____

*TIMOTHY M. O'BRIEN*
*CLERK OF COURT*

_____
s/Bonnie Wiest
*Signature of Clerk or Deputy Clerk*