IN THE

# United States Court of Appeals

## FOR THE TENTH CIRCUIT

◆◆

THE UNITED STATES OF AMERICA EX REL. MICHELE COFFMAN,

*Plaintiff-Appellant,*

—v.—

THE CITY OF LEAVENWORTH, KANSAS,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
HONORABLE JULIE A. ROBINSON
D.C. NO. 2:14-CV-02538-JAR

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com

*Attorneys for Plaintiff-Relator-
 Appellant Michele Coffman*

November 20, 2018

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................. ii

INTRODUCTION .......................................................... 1

ARGUMENT .............................................................. 3

   I.  Coffman can establish a claim under the False Claims Act
      based on implied certification...................................... 3

   II.  Materiality: the contractual requirements that the City treat
       wastewater and dispose of it in accordance with the Clean
       Water Act were material requirements. .......................... 9

   III. Scienter: the City acted with the requisite scienter in
       submitting claims for payment................................... 16

      A.  The Standard for corporate scienter.......................... 17

      B.  Coffman presented evidence which set forth a legitimate
          issue of material fact as to whether the scienter burden
          was met. ..................................................... 20

          1.  The broken sewer pipe and the effluent discharge into
             Five Mile Creek ........................................ 20

          2.  The Vactor truck dumping .............................. 22

   IV. The district court did not consider the facts in the light most
      favorable to the nonmoving party................................ 24

CONCLUSION............................................................ 28

CERTIFICATE OF COMPLIANCE....................................... 29

CERTIFICATE OF DIGITAL SUBMISSION............................. 30

CERTIFICATE OF SERVICE ............................................ 31

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Massachusetts v. Mylan Labs.*,
608 F. Supp. 2d 127 (D. Mass. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Mikes v. Straus*,
274 F.3d 687 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*MWK Int'l v. United States*,
2 Cl. Ct. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Shaw v. AAA Engineering & Drafting, Inc.*,
213 F.3d 519 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 7

*U. S. ex rel. Harrison v. Westinghouse Savannah River Co.*,
352 F.3d 908 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*Universal Health Services, Inc. v. United States and Massachusetts
ex rel. Escobar*,
136 S.Ct. 1989 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*U.S. v. Science Applications Intern Corp.*,
626 F.3d 1257 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

*United States ex rel A+ Homecare, Inc. v. Medshares Mgmt. Group*,
400 F.3d 428 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States ex rel. Badr v. Triple Canopy, Inc.*,
857 F.3d 174 (4th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States ex rel. Brooks v. Stevens-Henager College*,
305 F. Supp.3d 1279 (D. Utah 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States ex rel. Campie v. Gilead Sciences, Inc.*,
862 F.3d 890 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States ex rel. Conner v. Salina Regional Health Center*,
543 F.3d 1211 (10th Cit. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

*United States ex rel. Escobar v. Universal Health Servs., Inc.*,
842 F.3d 103 (1st Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States ex rel. Hagood v. Sonoma Cnty. Water Agency,*
929 F.2d 1416 (9th Cir. 1991)............................................. 23

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.,*
614 F.3d 1163 (10th Cir. 2010) ....................................*passim*

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.,*
892 F.3d 822 (6th Civ. 2018) .........................................9, 10

*United States ex rel. Thomas v. Black & Veatch Special Projects Corp.,*
820 F.3d 1162 (10th Cir. 2016) .........................................7, 9

## Regulations

40 C.F.R. Ch. I § 15.31................................................... 12

38 Fed. Reg. § 25161 (Sept. 12, 1973)................................... 12

## Statutes

31 U.S.C. § (b)(1)(i)-(iii)................................................. 17

31 U.S.C. § 3729(b)(4) ..................................................9, 16

Executive Order No. 11,738, "Clean Water Act" .......................*passim*

False Claims Act .......................................................*passim*

**INTRODUCTION**

One might expect a party defending a summary judgment order to argue confidently, and perhaps conservatively, that the order was reasonable and proper and should not be disturbed. The City of Leavenworth, however, in its zeal to defend the district court's summary judgment order, does the following:

- Overstates Tenth Circuit case law on *qui tam* implied false certification claims, creating the false notion that this Court and its cases are more restrictive than they actually are;

- Discounts the importance of contractual requirements that the City treat wastewater in a way that complies with the Clean Water Act, arguing that such requirements are mere "boilerplate" and are "tangential" to the purposes of the contracts, and that any violations of requirements that wastewater be properly treated and disposed of are "garden variety" regulatory violations;

- Attempts to impose burdens on the Plaintiff-Relator in this case, Michele Coffman, that Supreme Court and Tenth Circuit case law do not impose, arguing that her claim must fail if she cannot show that the government would not pay for wastewater treatment if it knew of the City's violations, and unless she can show that the government agencies expressly

conditioned payment on the City's compliance with environmental requirements; and

- Misdescribes certain facts, understating the extent of the City's environmental violations and overstating the approval it says it received from the Kansas Department of Health and Environment ("KDHE"), and ignoring sections of the record showing that the City knew its violations of the federal contracts and environmental laws were problematic.

Michele Coffman shows below that the district court misapplied the Supreme Court's decision in *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. 1989 (2016) and the Tenth Circuit case law, including the requirements that contract violations be material to the contract and that fraudulent claims be made with scienter. But Coffman essentially seeks just two things with this appeal: (1) that this Court apply its own case law and the Supreme Court's decision in *Escobar* faithfully, and (2) that the district court's summary judgment ruling be held to the standards of the Federal Rules of Civil Procedure, which require courts considering motions for summary judgment to consider facts in the light most favorable to the nonmoving party. Applying those two adjustments, the district court's order should be reversed, and the case should be remanded for trial.

# ARGUMENT

## I.     Coffman can establish a claim under the False Claims Act based on implied certification.

Let us not lose sight of the obvious: this is a False Claims Act case based on implied certification. We are in the Tenth Circuit. The City does not deny these things, of course, but it suggests, with only a little subtlety, that requirements pertaining to express certification cases, and the law of other circuits, apply in this case.

For example, the City argues that the representations in its wastewater treatment invoices to federal agencies were "objectively true," and were not misleading even if the City was in violation of the Clean Water Act. City Brief 19. But the entire basis of the "implied certification" variety of FCA claims, as described by the Supreme Court in *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. 1989 (2016), is that any representations, even though objectively true, are rendered misleading because of the contractor's "noncompliance with material statutory, regulatory, or contractual requirements." *Id.* at 2001. So the City's protestation that the representations in its invoices about wastewater flow and the City's operation and maintenance expenses for treatment are "objectively true," while itself objectively true, does nothing to undermine Coffman's FCA claim based on implied false certification. Coffman has never claimed that information in the invoices was objectively false, only that

unstated information regarding environmental compliance made the representations "misleading half-truths."

Likewise, the City seeks to impose a burden on Coffman that courts do not impose on relators in FCA implied certification cases, a burden that would require a showing of psychic powers. The City's invoices, it argues, were not "misleading half-truths" because they would not lead a reader to assume "(1) there were no bypasses in the City's sewer system, or (2) if the Vactor truck was used, its solid contents were not laid on the ground to dry." City Brief 48. It's true that no reader of the City's invoices would conclude from them that the City was mishandling waste. That is the point, though, of being a "misleading half-truth." The reason the invoices were implied false claims is that, in making objectively true representations about such things as wastewater flow and wastewater treatment operation expenses, and asking for payment based directly on that information, a reader would infer that the City complied with its obligations under the contracts and the environmental laws, when in fact it had not.

More significantly, the City misconstrues the case law on implied certification in this circuit. As shown in Coffman's opening brief, this Court has long recognized that FCA claims may be based on implied false certification, and that a mere invoice can form the basis for such a claim. *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 531-33 (10th Cir. 2000) (claim was viable because the

defendant "submitted invoices for full payment on the contract knowing it had failed to comply with . . . contract requirements").

The City argues that the Tenth Circuit has narrowed its approach to implied false certification cases since *Shaw*, and in support of that argument, the City relies heavily on *United States ex rel. Conner v. Salina Regional Health Center*, 543 F.3d 1211 (10th Cit. 2008). But the City's description of *Conner* leaves much to be desired. In describing the district court's holding in that case, it notes in bold that the district court held that a party's FCA claim is not actionable unless payment is "**expressly conditioned**" on certification. City Brief 50. And in the next sentence, the City notes that the "Tenth Circuit agreed" with the district court that compliance must be a prerequisite to payment. The City concluded that the Tenth Circuit affirmed the district court "because the regulations at issue did not make payment contingent upon a certification of compliance."[1] *Id.* at 51. Even more misleadingly, the City argues that, under *Conner*, "[b]ecause none of the federal contracts at issue in this case identify environmental compliance as a prerequisite to payment," Coffman's claim is not actionable. *Id.*

---

[1] In its zeal to mold *Conner* to its purposes, the City relies on *Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001), which the Tenth Circuit cited, even as it notes in its citation that *Mikes v. Straus* was "abrogated" by the Supreme Court's decision in *Escobar* (as was *Conner*).

Contrary to the City's misleading impression, the Tenth Circuit did not hold in *Conner* that payment must be expressly conditioned on compliance for an implied certification claim to be actionable.[2] And contrary to the City's argument, Conner was not a narrowing of FCA liability in this Circuit; this Court simply declined to extend FCA liability in a way that neither the Tenth Circuit nor other circuits had done before. *Conner* was an express false certification case in which the relator argued that a certification of compliance in an annual Medicare cost report rendered its claims for payment false, because payment was conditional on compliance with all laws relating to health care. There was evidence, however, that the government in fact used the certification of general compliance as a condition of participation in the Medicare program, and not a condition of payment, and that if a contractor was not in compliance, the government would work with the contractor rather than simply refusing to pay. *Id.* at 1221. The government has a "complex monitoring and remedial scheme that ends Medicare payments only as a last resort." *Id.* at 1222. Under these circumstances, this Court declined to extend FCA liability. And *Conner* was further abrogated by this Court's holding in *U.S. ex rel. Polukoff v. St. Mark's Hospital, et al.*, 895 F.3d 730 (10th Cir. July 9, 2018), *petition for reh'g denied*,

---

[2] In Coffman's opening brief, counsel inadvertently included a parenthetical description of *Conner* that obviously was the description of another case. Counsel regrets the error.

October 28, 2018, acknowledging the breadth of claims that are actionable under the FCA.

In suggesting that this Court has narrowed implied certification liability, the City pays little attention to this Court's subsequent holdings in *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163 (10th Cir. 2010) and *United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d 1162 (10th Cir. 2016). In *Lemmon*, decided two years after *Conner*, this Court recognized an implied false certification claim arising from environmental violations and pertaining to a waste disposal contract. 614 F.3d 1168-69. Reversing the district court's dismissal, this Court held that "materiality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid," but only that "the government *may* not have paid." *Id.* at 1170 (emphasis by Tenth Circuit). And in *Black & Veatch*, decided six years after *Lemmon*, this Court held that "the pertinent inquiry for implied-false-certification claims is not whether a payee made an affirmative or express false statement, but whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment." Thus, since recognizing implied false certification claims in *Shaw*, this Court has not narrowed FCA implied false certification liability.

As Coffman showed in her opening brief, she can establish a claim under the False Claims Act based on implied false certification, whether under this Court's cases

recognizing that submitting invoices for payment impliedly certifies that the contractor is entitled to payment, or under the Supreme Court's more specific scenario in *Escobar*, in which the Supreme Court recognized a cause of action based on implied certification when invoices contain specific representations that, based on noncompliance with contractual requirements, are "misleading half-truths." *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2001. As set forth below in discussing the materiality of the compliance requirement, the City's contracts with the federal government contained requirements that the City not only accept and move wastewater, but to "treat" and dispose of wastewater, in a manner that protected public health, and in compliance with environmental requirements, specifically including the Clean Water Act. The City submitted invoices that requested payment based on information in the invoices regarding the amount of wastewater treated and the City's wastewater treatment expenses allocated to the federal agencies based on the level of flow. City Brief 48. The City often had not, in fact, complied with the requirements of the Clean Water Act, and in some instances had not even treated wastewater it accepted, allowing untreated, raw sewage to be discharged into the creek that runs adjacent to the wastewater treatment plant. The City's noncompliance with the requirements of the contracts and the law concerning treatment and disposal of wastewater made the City's representations in its invoices misleading half-truths. The City is therefore

8

liable under the False Claims Act for its fraudulent invoicing and collection of payment for services it did not provide.

## II. Materiality: the contractual requirements that the City treat wastewater and dispose of it in accordance with the Clean Water Act were material requirements.

As Coffman showed in her opening brief, the False Claims Act defines "material" broadly as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d at 1170 ("materiality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid," but only that "the government *may* not have paid.") (emphasis by Tenth Circuit); *Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d at 1169 (10th Cir. 2016).

The Supreme Court in *Escobar* recognized a holistic, multifaceted analysis of materiality, holding that it "cannot rest on 'a single fact or occurrence as always determinative.'" *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 2001, *quoting Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011). Since *Escobar*, several circuits have expressly recognized that the holistic nature of the materiality inquiry can render it inappropriate for resolution as a matter of law, particularly when factors point in different directions. *See United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d

at 831-37 (Sixth Circuit, holding that "the analysis of materiality is 'holistic'");

*United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 904-06 (9th Cir.

2017); *United States ex rel. Badr v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir.

2017) (materiality analysis that considered "common sense" and efforts of the

contractor to conceal its noncompliance "perfectly aligns" with the Supreme

Court's materiality analysis in *Escobar*); *United States ex rel. Escobar v. Universal

Health Servs., Inc.*, 842 F.3d 103, 109-112 (1st Cir. 2016) (in light of the Supreme

Court's decision in *Escobar*, "courts are to conduct a holistic approach to

determining materiality in connection with a payment decision, with no one factor

being necessarily dispositive"); *United States ex rel. Brooks v. Stevens-Henager

College*, 305 F. Supp.3d 1279 (D. Utah 2018) ("Materiality depends on

a holistic assessment of many factors").

A misrepresentation is material if it goes "to the very essence of the bargain."

*Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*,

136 S.Ct. at 2003 n. 5, citing *Junius Constr. Co. v. Cohen*, 257 N.Y. 393, 400

(1931); *see United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*,

892 F.3d 822, 831 (6th Cir. 2018). The Supreme Court in *Escobar* held, based on

impliedly false certifications that were "so central" to the purpose of the contract,

that the district court's dismissal of the implied false certification claim was in error.

*Id.* at 2004. This Court likewise has noted the centrality of environmental

compliance as affecting materiality in another FCA case based on improper waste disposal, noting that "Plaintiffs also showed that the violations undercut the purpose of the contracts – the safe and permanent disposal of waste." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d at 1169.

Thus, in assessing materiality, it is appropriate to look to the contracts, the relevant statutes, and the applicable regulations. *Universal Health Services, Inc. v. United States and Massachusetts ex rel. Escobar*, 136 S.Ct. at 1995. The contracts here required not only that the City take wastewater off the hands of the federal agencies, but that they treat it and dispose of it properly. For example, the heart of the City's contract with the Army, the "Services to be Rendered" section, requires that the City "shall furnish a sanitary sewer connection and sanitary sewage service as required by the Government and shall receive, carry, treat, and dispose of all sanitary sewage . . . in a manner and by such means as will constitute no hazard to the public health" and that the City "shall operate its sewage disposal and treatment facilities in conformity with applicable laws, rules, and regulations promulgated by Federal, state and local authorities. A110, A677-678. Likewise, the City's contract with the Bureau of Prisons provided that the government had "directed the City to provide secondary treatment of waste water" and that the Bureau of Prisons would be billed based on the volume of wastewater it treated. A622-623. And the City's contract with the Veterans Administration required "wastewater treatment" and

billing based on volume. A607. The City's contract with the VA further required that the City comply with environmental requirements, specifically including the Clean Water Act, and it defined "clean water standards" as "any enforceable . . . requirement which is promulgated pursuant to the Water Act or contained in a permit issued to a discharger by the [EPA] or by a State under an approved program as authorized by Section 402 of the Water Act . . .."[3] A620.

As explained in Coffman's opening brief, the Clean Water Act prohibits the discharge of any pollutant to any waters of the United States without a permit, and unless any pollutants in the discharges are within the limitations set forth in the permit. Moreover, federal regulations require that all federal contracts include provisions requiring compliance with clean water standards. 40 C.F.R. Ch. I § 15.31; *see also* Executive Order No. 11,738, 38 Fed. Reg. §25161 (Sept. 12, 1973).

In spite of the government's insistence on requiring compliance with clean water standards in the contracts, statute, and regulations, the City attempts to downplay the importance of environmental compliance. Indeed, while admitting in the record (A705-706) and in its brief (City Brief 26) that environmental compliance is "important," the City also attempts to minimize that importance at every turn,

---

[3] The environmental compliance requirement in the City's contract with the VA purports to apply if the contract amount exceeds $100,000 annually. A620. Based on the affidavit of Ruby Maline, the City's Finance Director, the VA's monthly allocation was $8,419.31, which is over $100,000 annually. A474.

arguing that language requiring compliance is mere "boilerplate" (City Brief 26) and that the violations Coffman alleges were "garden variety regulatory violations" (City Brief 23) that "touch only indirectly and tangentially" on waste treatment (City Brief 17). The district court likewise minimized the importance of the environmental compliance requirements.

As Coffman showed in her opening brief, however, compliance with environmental laws, and in particular with clean water standards, is at the core of the City's contracts with the federal agencies, and is in fact the very reason for their existence. The agencies here contracted with the City to collect, treat, and dispose of their wastewater in compliance with environmental laws. *See United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d at 1169 (purpose of contracts was "the safe and permanent disposal of waste."). If environmental compliance were not a concern, there would be little or no reason for any government agency to use the City's wastewater treatment services, as the agencies could simply discharge wastewater to the ground or to the nearest creek.

Contrary to the City's attempt to minimize the importance of environmental compliance, the environmental violations Coffman has shown do not relate "indirectly and tangentially" to wastewater treatment, but directly to it. With the City's discharge of untreated sewage to Five Mile Creek, for example, the City permitted sewage from its plant to pollute a creek the City has no permit to

discharge to, and it attempted to mask the effects of that discharge with a further illegal discharge of treated wastewater to the same creek. The City suggests that that discharge involved "a sewer line that serviced a single customer" (City Brief 28) and that events pertaining to "this private line" left the government agencies and other customers "unaffected" by this discharge (City Brief 29). The City's suggestion is contrary to the record, which contains no reference to any sewage leaking from that "single customer," but shows instead that the sewage discharge came from the City's wastewater treatment plant. *See, e.g.*, A200 (City employee notes a sewage line break on the "east side of our facility" and describes attempts to stem the discharge "on *our side* of the creek") (emphasis added); A194 (same City employee describes sewer pipe damage "in front of the waste water treatment plant"); A197 (bypass report submitted to KDHE states, "erosion caused large sections of concrete to slide down the hill and damage pipe crossing the creek"); A280 (City's Director of Public Works describing citizen report "that the City was discharging raw sewage").

Further attempting to minimize the materiality of the contracts' wastewater treatment and environmental compliance requirements, the City argues that "there is no evidence the federal agencies . . . intended to hold the City to a higher regulatory standard than KDHE." City Brief 29. This argument is a red herring designed to blur the differing roles of KDHE and the government agencies. The

government agencies sought proper treatment and disposal of waste. They did not promulgate standards that were any more or less stringent than the City's KDHE-issued discharge permit. The City cannot escape liability for improperly invoicing the government agencies simply because KDHE did not enforce certain violations of the City's NPDES permit and the Clean Water Act.

The City further attempts to minimize the materiality of its obligations with a long quote from *Escobar*, in which the Court stated that, in contracts for health services, requirements that "contractors buy American-made staplers" or comply with "the entire U.S. Code and Code of Federal Regulations" are not material. City Brief 26. But this case is not analogous to a health care contractor being required to buy American-made staplers. It is analogous to a health care contractor being required to provide health care. And the City's contracts here do not require compliance with the entire set of laws in this country, but with environmental laws, and specifically with the Clean Water Act, which deals with the proper treatment and disposal of wastewater, the contracts' *raison d'etre*.

And finally, the City repeats the district court's factual error that "[t]here is no evidence that the City did not provide the contracted service—treatment of these [federal] agencies' sewage." City Brief 27-28. But as Coffman has shown, the record is replete with examples that the City did not treat the City's waste properly,

and in some instances did not treat it at all. Indeed, in some instances, the City discharged raw, untreated wastewater, without a permit, into Five Mile Creek.

In these circumstances, in which the government has required in statutes, regulations, and contracts that the City properly treat and dispose of wastewater the government is paying for, it should be, at a minimum, a question for reasonable jurors whether full knowledge of the City's conduct might have "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" to the City (31 U.S.C. § 3729(b)(4)).

### III. Scienter: the City acted with the requisite scienter in submitting claims for payment.

The City argues that the District Court properly ruled that there was no evidence of corporate scienter, undermining Coffman's FCA claim. City Brief 32-34. Specifically, the City contends that the "collective knowledge" standard has been rejected by the courts and asserts that in order to show corporate scienter, Coffman must show both that a City employee knew of the violations and also knew that they were material to the federal agencies, or that the city acted with reckless disregard for the law. But the City's argument misconstrues Coffman's argument regarding the standard for corporate scienter and overlooks numerous facts, which if taken in the light most favorable to Coffman, establish a reasonable inference of scienter such that Coffman had a right to have her claims heard by a jury.

## A. The standard for corporate scienter

In order to establish corporate scienter under the False Claims Act, a relator must show that at least one employee "knew" of the fraud and that the fraud was material to the government's decision to pay. The FCA defines "knowing" and "knowingly" as having actual knowledge or acting in deliberate ignorance or reckless disregard of the truth or falsity of the information.   See 31 U.S.C. (b)(1)(i)-(iii). A relator need not show intent to defraud. Instead, fraud is shown in an FCA case when there are sufficient facts from which a fact finder could conclude that a party acted with reckless disregard for the truth or falsity of the information.  Such an analysis is necessarily fact-intensive.

The City, relying on *U. S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908 (4th Cir. 2003) and *U.S. v. Science Applications Intern Corp.*, 626 F.3d 1257 (D.C. Cir. 2010), contends that Coffman inappropriately relies on so-called "collective knowledge" of City employees to establish scienter. But that statement overstates the holdings of the cases, ignores relevant facts, and generally misconstrues Coffman's arguments.

In *Harrison*, the Court expressly rejected Defendant's request that it apply the so called "single actor" requirement in a false certification case.  In support of its decision, the *Harrison* court noted that such a rule (*i.e.*, requiring a showing that the same employee knew of the impropriety and understood its importance) would

permit corporations to avoid false certification liability in all circumstances by simply segregating contracting offices and making their only function to execute contracts. *See Id*. at 919 (holding "we decline to adopt [Defendant] Westinghouse's view that a single employee must know both the wrongful conduct and the certification requirement. If we established such a rule, corporations would establish segregated 'certifying' offices that did nothing more than execute government contract certifications, thereby immunizing themselves against FCA liability."). As the City points out, the Court also rejected the notion that Relators in False Claims Act cases could rely on the "collective knowledge." *Id.* at 918. Instead, the *Harrison* court struck a middle ground, refusing to adopt either the collective knowledge or the single actor theory, and following the reasoning of the Eleventh Circuit, which held that a corporation could be held liable under the FCA even though its certifying employee was unaware of another employee's wrongful conduct. *See United States ex rel. Harrison*, 352 F.3d at 920 (*citing Grand Union Co. v. United States*, 696 F.2d 888 (11th Cir. 1983).

In *U.S. v. Science Applications Intern. Corp.*, 626 F.3d 1257, 1276, (D.C. Cir. 2010), also cited by the City, the D.C. Circuit also chose the middle ground finding that, if an employee "knew or recklessly failed to know that [the City], by having [OCIs] and failing to disclose them, violated a requirement under its [Nuclear Regulatory Commission] contract that was material to the receipt of payment, then

18

that finding would be enough to establish [the City's] scienter. In addressing the government's concerns that rejecting the collective knowledge theory would open the door for corporations to compartmentalize knowledge and avoid meeting the "knowing" threshold, the D.C. Circuit observed that "if a Plaintiff can prove that a government contractor's structure prevented it from learning facts that made its claims for payment false, then the Plaintiff may establish that the company acted in deliberate ignorance or reckless disregard of the truth of its claims." *Id.* In reaching that conclusion, the Court focused on the legislative history of the Act and Congress' statements that it adopted the broader definition of "knowingly" to "capture the 'ostrich-like' conduct which can occur in large corporations where' corporate officers . . . insulate themselves from knowledge of false claims submitted by lower-level subordinates." *Id.* at 1274-1276, (*citing* S. Rep. No. 99-345, at 6 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272.). Thus, there are numerous avenues through which an FCA relator can make a viable showing of corporate scienter. As set forth below, Coffman presented ample evidence from which a reasonable fact finder could have concluded there was scienter of a violations rendering claims for payment fraudulent. Thus, summary judgment was inappropriate.

### B. Coffman presented evidence establishing a legitimate issue of material fact regarding scienter.

The City contends that Coffman cannot show scienter because it reasonably relied on KDHE's assurances of compliance. City Brief 35-36. But this statement intentionally overlooks numerous relevant facts, which the District court also inexplicably discounted.

#### 1. The broken sewer pipe and the effluent discharge into Five Mile Creek

The City contends Coffman cannot show scienter with regard to the broken sewer pipe or the effluent discharge into Five Mile Creek because KDHE had been informed of the practices and, in the case of the effluent discharge, had directed it. City Brief 35-39. The City takes a "head in the sand" approach to these discharges, as it was well aware that the discharge violated its NPDES permit. The City should be charged with knowledge of what is in its own permit, which prohibited any unpermitted discharges and which authorized discharges only of treated wastewater, and only to the Missouri River. A380-391. The City claims that KDHE directed the violation, but there is *no contemporaneous documentary evidence* in the record that KDHE gave permission to the City not to fix the broken sewer pipe or to discharge treated effluent into Five Mile Creek. The only portion of the contemporaneous documentary record in which KDHE has any voice is a series of emails between KDHE's Chris Seeds and City employee Chad Lough, in which

Seeds monitors the progress, or lack thereof, with respect to fixing the broken sewer pipe. A203. On June 7, 2011, for example, Seeds asks whether the repair has been made yet, and the Lough responds that it had not. *Id*. Moreover, the City was concerned about KDHE "poking around" and that they would be in "big trouble" in "short order" if they did not act.[4] A773.

All of the contemporaneous documentary evidence – the City's NPDES permit, KDHE's emails monitoring the broken sewer pipe, and the City's email regarding "trouble" with KDHE if the pipe was not soon repaired – suggests that the City was aware that (or at least showed reckless disregard for whether) the City was in violation of its permit, the law, and the contracts. The only contemporaneous evidence the City cites for its argument a KDHE inspection report from October 2010, two months into the period of the broken sewer pipe, but that report contains no mention of the sewer pipe or of the effluent discharge the City now says KDHE was aware of and authorized. A219-227. The City offers no evidence that KDHE approved the discharges except for two affidavits prepared in 2017, six years after the broken sewer pipe had been repaired. A281-282, A309-312. Thus, the evidence regarding the discharges to Five Mile Creek creates at least a material fact requiring a jury's analysis.

---

[4] The City argues that this document is hearsay, but Coffman offers it to show the City's state of mind, not the truth of the matter asserted, and in any event it is an admission.

## 2. The Vactor truck dumping

The City relies on correspondence from KDHE that the WWTP plant was in compliance with all applicable regulatory schemes. That argument is problematic in several respects. First, there was ample evidence that KDHE did not have complete knowledge of the City's practices with regard to the Vactor truck dumping. Indeed, as Coffman showed in her brief before the district court, numerous operators at the plant were shocked that KDHE's inspection was extremely cursory and did not include an inspection of the actual dumping site. A734-735 ("We watched them walk around the plant with Mr. Klingler" and "[t]hey never went back to the back fence"); A1000 ("I remember everybody being amazed that they didn't even get taken back there").

Second, Michael McDonald, the City's Public Works Director, City Engineer, and Rule 30(b)(6) corporate representative, specifically testified that he did not know what KDHE had been told about the City's dumping practices, what KDHE had actually inspected, or what the basis was for KDHE's approval of the dumping practices. A697. Moreover, multiple employees testified that what the Vactor truck dumped was permanently left on the ground behind the plant. A734-735; A987-A999; A1011, A1172. This contradicts KDHE's statement that solids from the "vac truck" are deposited "for processing" and "are being handled properly." A285. Assistant Superintendent Tim Guardado testified that leaving

contents on the ground would violate the city's permit. A859. That gave Defendant scienter and reason to lie to inspectors. If KDHE did not have all the relevant facts when it opined that the City had complied with the applicable regulations in regard to the WWTP, its assurances of compliance were meaningless. *See United States ex rel A+ Homecare, Inc. v. Medshares Mgmt. Group*, 400 F.3d 428, 454 n. 21 (6th Cir. 2005); *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (requiring disclosure of "all the underlying facts"); *see also Massachusetts v. Mylan Labs.*, 608 F. Supp. 2d 127, 149 (D. Mass. 2008).

Third, McDonald knew of the dumping practices, and had testified that it was "unseemly" and could be "perceived as illegal dumping." A688. McDonald, a highly trained engineer, had a license that required him to have an understanding of the statutory regulatory framework for the WWTP. If McDonald had a question about the legality of a practice, he had an obligation to look into the matter to confirm that the City was meeting its contractual obligations. *See MWK Int'l v. United States*, 2 Cl. Ct. 206, 209-10 (1983) (a government contractor has a duty to submit an inquiry concerning contract provisions to the designated contracting officer," and if the contractor "fails to so inquire, the contractor cannot later rely on its uninformed interpretation of contract provisions to circumvent the government's interpretation).

Finally, McDonald acknowledged on behalf of the City that regulatory compliance was an important part of the contracts. A706. Thus, given his concerns about the propriety of the dumping, he either had actual knowledge of the violations or was recklessly indifferent to them. Either way, Coffman meets her burden of establishing, at a minimum, a jury question regarding corporate scienter.

## IV. The district court did not consider the facts in the light most favorable to the nonmoving party.

In ruling on summary judgment, a court must view the facts in the light most favorable to the nonmoving party. Coffman showed in her opening brief that the district court did not do so in several ways. The district court:

- Stated that Coffman "presents no evidence to suggest that the City did not treat the wastewater as represented in the monthly bills" (A1199), ignoring significant evidence that the City in fact had not treated wastewater as contracted and billed;

- Ignored evidence that the City was concerned about what KDHE might do if the City did not repair the broken sewer pipe in Five Mile Creek (A773);

- Ignored the complete lack of contemporaneous documentary evidence supporting the City's argument that KDHE approved of its actions with respect to Five Mile Creek;

- Downplayed the significance of the information and representations in its invoices to the government agencies regarding the amount of wastewater it had treated, and in what manner;

- Ignored evidence that KDHE was unaware of the City's actual practice of dumping sewage on the ground in back of the wastewater treatment plant (A734-735, A859, A987-989, A1011, A1172);

- Ignored evidence that the City believed its dumping might be perceived as illegal (A688); and

- Ignored testimony of City employees regarding what KDHE inspected or did not inspect and what information KDHE was aware of (A734-735, A998, A1000).

The City does not address Coffman's argument that the district court failed to view the facts in the light most favorable to Coffman. Instead, the City exacerbates the district court's factual errors by doubling down on them and adding more of its own. For example, the City argues with respect to the broken sewer pipe in Five Mile Creek that "[t]here is no dispute that KDHE, aware of the leak, twice inspected the [wastewater treatment plant] and found the City in compliance with its NPDES permit." City Brief 28. In fact, as noted above, the contemporaneous documentary record contains no evidence that KDHE made any such finding, and the City offers no evidence that KDHE approved the City's discharges to Five Mile

Creek other than two affidavits prepared in 2017, six years after the broken sewer pipe had been capped. A281-282, A309-312.

The only contemporaneous documentary evidence in the record of KDHE's knowledge of the broken sewer pipe was a series of emails from Chris Seeds of KDHE, who was monitoring the situation, but who did not suggest any that KDHE approved of the City's actions. For example, on June 7, 2011, ten months after the City reported the broken sewer pipe, Seeds emailed the City's Chad Lough, asking, "Have these repairs been completed?" A203. Lough's answer was that they had not. *Id*.

In addition, as noted above, the City suggests that the broken sewer pipe involved only a single, private customer and that the government agencies were "unaffected" by the discharge. City Brief 29. In fact, the broken sewer pipe resulted in untreated sewage leaking from the wastewater treatment plant itself, affecting all customers, with the possible exception of the "single customer" to which the City points. *See* pp. 13-14 above; A194, A197, A200.

The City also misdescribes the City's discharge of effluent into Five Mile Creek, stating that Coffman "claims that the City violated its permit because, on a single occasion in August 2013, it discharged effluent . . . into 5-Mile Creek." City Brief 29. Coffman did not allege that this illegal discharge occurred on "a single occasion." She alleged that "the City began discharging wastewater . . . upstream

of the broken sewer pipe," not on a single occasion, but "[a]fter the broken sewer pipe leaked sewage into Five Mile Creek," i.e., beginning in August 2010. Coffman Opening Brief 11, 33. The City does not cite to the record for this strange assertion, and the record contains no suggestion that this discharge occurred only on "a single occasion."

Finally, the City argues with respect to Coffman's argument that materiality presents a fact question for the jury, "the Supreme Court has rejected that position," citing *Escobar*. City Brief 31. Of course, the Supreme Court was not considering whether the City could obtain summary judgment against Coffman, and it did not rule that summary judgment must always be entered in favor of FCA defendants. Perhaps the City did not mean what it wrote. But in light of the City's factual misstatements, which exacerbate the district court's failure to consider the facts in the light most favorable to Coffman when considering the City's motion for summary judgment, the district court's summary judgment order should be reversed.

## CONCLUSION

The City of Leavenworth invoiced government agencies based on wastewater treatment expenses attributable to those entities resulting from their wastewater flow. In doing so, the City falsely implied that it had complied with contractual and regulatory requirements regarding the proper treatment and disposal of wastewater, when in fact it had violated those requirements. The district court, however, granted the City's request for summary judgment, even though it did not review the facts in a light most favorable to Coffman. The district court's order should be reversed, and the case should be remanded for trial.

Dated: November 20, 2018

Respectfully submitted,

By */s/ Mark V. Dugan*
MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collinslegal.com

*Attorneys for Plaintiff-Relator-*
*Appellant Michele Coffman*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

a)      this Brief contains 6,423 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

b)      this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, in Times New Roman 14-point font.

Dated: November 20, 2018

By */s/ Mark V. Dugan*

MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collingslegal.com

*Attorneys for Plaintiff-Relator-*
   *Appellant Michele Coffman*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) All required privacy redactions have been made per 10th Cir. R. 25.5;

(2) The hard copies that have been submitted to the Clerk's Office are exact copies of the ECF Filing; and

(3) The ECF submission have been scanned for viruses with the most recent version of Security Manager AV Defender v. 6.6.2.49 (last update 11.20.2018) and, according to the program are free of viruses.

Dated: November 20, 2018

By */s/ Mark V. Dugan*
MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collingslegal.com

*Attorneys for Plaintiff-Relator-*
*Appellant*

## CERTIFICATE OF SERVICE

I certify that, on November 20, 2018, I caused the forgoing brief to be electronically filed with the Clerk of the Court using the CM/ECF system, which provides notification of such filing to all counsel of record.

By */s/ Mark V. Dugan*

MARK V. DUGAN
HEATHER J. SCHLOZMAN
DUGAN SCHLOZMAN LLC
8826 Santa Fe Drive, Suite 307
Overland Park, Kansas 66212
(913) 322-3528
mark@duganschlozman.com
heather@duganschlozman.com

ROBERT COLLINS
COLLINS LAW OFFICE, LLC
P.O. Box 4786
Olathe, Kansas 66063
(913) 538-7472
robert@collingslegal.com

*Attorneys for Plaintiff-Relator-*
  *Appellant Michele Coffman*